E-FILED
Tuesday, 19 February, 2019  10:27:04 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| DERICK BROWN, ATIBA FLEMONS, and JEFFREY TAYLOR<br><br>On behalf of themselves and all others similarly situated,<br><br>**Plaintiffs**,<br><br>**v.**<br><br>THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS<br><br>**Defendant.** | **No. 2:19-cv-02020-CSB-EIL**<br><br>**CLASS ACTION AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Derick Brown, Atiba Flemons, and Jeffrey Taylor on behalf of themselves and all others similarly situated, upon personal knowledge as to themselves and upon information and belief as to other matters, hereby complain as follows:

### STATUTES, JURISDICTION AND VENUE

1.     Plaintiffs bring this putative class action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. ("Title VII") and the Illinois Civil Rights Act of 2003, 740 ILCS 23/5 ("ICRA").

2.     This Court has subject matter jurisdiction over the Title VII claims pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1343(a)(4), and supplemental jurisdiction over the ICRA claims pursuant to 28 U.S.C. § 1367.

3.     Pursuant to 42 U.S.C. Sec. 2000e-5(f)(3), venue is proper in the Urbana Division of the Central District of Illinois because a substantial part of the employment practices alleged herein to be unlawful were committed within this judicial district.

## NATURE OF THIS ACTION

4.      Plaintiffs Brown, Flemons, and Taylor (hereinafter "Class Representatives" or "Named Plaintiffs") file this Amended Complaint as a putative class action against the University of Illinois Board of Trustees.

5.      The Class Representatives allege that the University is in violation of Title VII and ICRA.

6.      The Class Representatives seek to represent a class or classes comprised of former, current, and future black employees at the University of Illinois' campuses (referred to collectively as the "University"), excluding University officers with authority to make policy concerning discrimination, who have been subjected to one or more of the discriminatory policies or practices described in this Amended Complaint.

7.      The Class Representatives seek declaratory and injunctive relief; compensatory damages; and attorneys' fees, costs, and expenses to eliminate the University's policy of racial harassment and to make victims whole.

## PARTIES

A.      **Plaintiffs**

8.      Plaintiffs are black employees of the University.

9.      Plaintiffs are employees of the University within the meaning of Title VII.

10.     Derick Brown is employed as a Machinist in the Facilities and Services (F&S) department at UIUC. Brown has worked at the University since 2006.

11.     Atiba Flemons is employed as a Brick Mason in F&S at UIUC. Flemons worked for the University from 2008 to 2009 when he was laid off, and again from 2011 to present.

12.     Jeffrey Taylor is employed as a Culinary Worker III in the Dining department at UIUC. Taylor has worked at the University since 2015.

**B.      Defendant**

13.     The University of Illinois is a public institution of higher education under the authority of the State of Illinois Compiled Statutes. 110 ILCS 205 Sec. 1(a).

14.     The Board of Trustees is the governing body of the University of Illinois and is a corporate body and a political subdivision under the authority of the State of Illinois Compiled Statutes. 110 ILCS 305 Sec. 1.

15.     The University of Illinois has campuses in Urbana-Champaign ("UIUC"), Chicago ("UIC"), and Springfield ("UIS"), in addition to several regional campuses in Illinois that specialize in specific educational curricula.

16.     The University is an employer within the meaning of Title VII.

## PROCEDURAL HISTORY

**A.      Administrative Exhaustion**

17.     Class Representatives exhausted their administrative remedies prior to filing their Complaint, Dkt. 1.

18.     Class Representative Brown timely filed a Charge of Discrimination against the University with the Equal Employment Opportunity Commission ("EEOC") on behalf of himself and a class of similarly-situated persons on December 19, 2017, alleging, *inter alia*, hostile work environment based on race and retaliation.

19.     On December 13, 2018, Brown received a Notice of Right to Sue from United States Department of Justice ("DOJ").

20.     Class Representative Flemons timely filed a Charge of Discrimination with the EEOC against the University on behalf of himself and a class of similarly-situated persons on February 2, 2017, which was amended on May 18, 2017, alleging, *inter alia,* hostile work environment based on race, disparate treatment, and retaliation.

21.     On May 25, 2018, Flemons received a Notice of Right to Sue from the DOJ.

22.     Class Representative Taylor timely filed a Charge of Discrimination against the University with the EEOC on behalf of himself and a class of similarly-situated persons on July 19, 2018, alleging, *inter alia*, hostile work environment based on race, disparate treatment, and retaliation.

23.     Following a period of 180 days after filing his Charge, the EEOC had not yet issued Taylor a Notice of Right of Sue. Taylor requested a Notice of Right to Sue on January 16, 2019, to which he is entitled.

24.     On February 5, 2019, the EEOC indicated it was forwarding Taylor's request for a Notice of Right to Sue to the DOJ.

**B.      Tolling Agreement**

25.     On August 21, 2017, the Parties entered into an agreement ("Tolling Agreement"), which tolled all applicable statutes of limitations and filing requirements with respect to, *inter alia,* harassment, disparate treatment, and retaliation claims for several University employees, including Class Representatives Brown, Flemons, and Taylor.

26.     The Tolling Agreement continued through and including January 29, 2019.

27.     Plaintiffs timely filed their Complaint, Dkt. 1, on January 28, 2019.

**UI'S ORGANIZATIONAL STRUCTURE**

28.     The University of Illinois is governed by the University President and the Board of Trustees.

29.     Timothy L. Killeen is the President of the University of Illinois.

30.     Dedra M. Williams is the Secretary of the Board of Trustees and Secretary of the University Counsel's office.

31.     The University of Illinois' campuses are governed by campus Chancellors who report directly to the President and Board of Trustees.

32.     Robert J. Jones is the Chancellor of UIUC.

33.     Barb Wilson is the former Interim Chancellor of UIUC.

34.     Michael D. Amiridis is the Chancellor of UIC.

35.     Susan J. Koch is the Chancellor of UIS.

36.     The University's campuses have several "units" or departments whose directors report to the campus Chancellors.

37.     Each University campus maintain an Office for Access and Equity unit, which report directly to the campus Chancellor.[1]

38.     The University's OAE offices are the senior organizations at each campus charged with investigating complaints of racial harassment (and all other forms of discrimination), determining whether the University's Nondiscrimination Policy (the "NDP") was violated, and the appropriate response to any violations.

39.     The University of Illinois maintains one central human resources department, University or System Human Resources, which has offices on each campus.

40.     There are three primary groups of employees at the University: Faculty, Academic Professionals, and Civil Service employees.

41.     The University NDP applies to all three employee groups.

42.     Academic Professionals are members of the academic and administrative staff "whose positions have been designated by the President and the Chancellor as meeting specialized administrative, professional, and/or technical needs, in accordance with Article IX of the University of Illinois Statutes."

---

[1] Until late-2017, the Office of Access and Equity at UIUC was called the Office of Diversity, Equity, and Access, abbreviated ODEA. At UIS, the sister-office to UIUC's and UIC's OAE offices, is called the Office for Access and Equal Opportunity, but will be abbreviated herein as OAE.

5

43.     Civil Service employees "fulfill clerical, technical, support, service, crafts, trades, and professional roles throughout [the University]. Their titles are defined under a classification system governed by the Illinois State Universities Civil Service System."

## I.      CLASS CLAIMS

## RACIAL HARASSMENT IS THE UNIVERSITY'S STANDARD OPERATING PROCEDURE

44.     University supervisors and other employees frequently use racial slurs and offensive stereotypes, calling black employees "n*ggers," "boy," "monkeys," "lazy," "angry," "rowdy," and "Aunt Jemima," and other offensive racial language.

45.     Class members are exposed to threats of racial violence, such as nooses, swastikas, KKK garb, racist graffiti, and confederate flags, including the noose and swastika pictured here:




*(Noose that a white Groundworker tied and threw in front of a black Groundworker seated at the table in F&S in April 2016)*     *(Swastika that a black Dining employee found in the bathroom of the Food Stores building in December 2016)*

46.     University supervisors and employees also excessively monitor, scrutinize, belittle, and disrespect class members, and treat them as less credible and capable than white employees.

47.     The University's standard operating procedure is racial harassment of class members, implemented by the following:

a)      The University has a policy of allowing racial harassment unless it is

"sufficiently severe or pervasive," "objectively offensive," and "unreasonably interferes with, denies, or limits a person's ability to participate or benefit from employment opportunities, assessments or status at the University;"

b)      The Director of the University's OAE department at UIUC openly directs racial slurs and stereotypes at black subordinates, and the University's OAE department at UIUC is itself rife with internal racial harassment. As a consequence, the University's senior anti-bias unit at UIUC instead acts as an agent of bias;

c)      The University maintains a pattern or practice of intentionally avoiding finding that racial harassment constitutes a violation of its NDP. To this end, the University's Human Resources and OAE departments, along with senior leadership at the University, (i) ignore racial harassment complaints; (ii) fail to initiate investigations into complaints it acknowledges receiving; (iii) suggests complainants engage in dispute resolution, without explaining they have the right to an investigation, defeating OAE's purpose to root out discrimination; and/or (iv) do not conduct bona fide investigations into complaints of racial harassment.

48.     By design, the University's written NDP, as evidenced by UIUC's and UIS's published definitions and procedures (discussed below), not only fails to deter racial harassment, it permits it.

49.     As a consequence, any black employee understands that she or he may be subjected to racial degradation and symbols of racial violence at any time, and that the University will provide no remedial assistance or protection from further racial harassment. This

7

makes the University a racially hostile work environment.

A.     **The University's Racial Harassment Policy in Action**

50.     Evidencing the existence of an actual policy of racial harassment, the University

maintains written definitions of harassment, which demonstrate how its NDP permits a threshold

level of racial harassment.

51.     By way of example and not limitation, UIUC defines harassment that violates the

NDP as:

> A form of discrimination and unwelcome conduct based on an individual's status
> within a Protected Classification. The unwelcome conduct may be verbal, written,
> electronic or physical in nature. This policy is violated when the unwelcome
> conduct is based on one or more of the protected classifications (defined below),
> and is either: (1) sufficiently severe or pervasive; and (2) objectively offensive; and
> (3) unreasonably interferes with, denies, or limits a person's ability to participate
> or benefit from educational or employment opportunities, assessments, or status at
> the University. . . .

52.     UIS's written sexual harassment policy, which is the only guidance published by

UIS concerning its definition of harassment, suffers from virtually the same basic faults as

UIUC's.

53.     UIS's definition of sexual harassment only prohibits it to the extent the

harassment is:

> . . . [a] based on sex, sexuality, Gender Identity, Gender Expression, or Sexual
> Orientation; . . . [b] sufficiently serious (i.e., severe, pervasive, or persistent) and
> objectively offensive so as to deny or limit a person's ability to participate in or
> benefit from UIS's programs, services, opportunities, or activities ; or c) Ha[s] the
> purpose or effect of unreasonably interfering with an individual's employment.

54.     These three elements that the University employs to determine whether

harassment violates its NDP are among the burdens of proof a Title VII plaintiff faces in court.

55.     "Severe or pervasive," the first element, is the factual showing a plaintiff must

make under Title VII—in court—in order to establish that the harassment unreasonably

interfered with the plaintiff's ability to perform his or her job, the third element, and therefore altered the terms or conditions of employment. By requiring separate proof of the third element, *the University places a greater burden of proof on a University employee seeking an investigation and remedial action than a Title VII plaintiff faces in court.*

56.     Requiring complainants to make out the same elements of a Title VII case required in court (or more), frustrates the purpose of investigation of an alleged violation of the NDP.

57.     Internal employer investigations of racial harassment are required by Title VII to facilitate reporting and remediation of racial harassment *before it becomes severe or pervasive*:

> *Ellerth/Faragher* is also designed to incentivize employees in a way that delivers on Title VII's "primary objective," which is "not to provide redress but to avoid harm." *Faragher,* 524 U.S. at 806... Indeed, *Ellerth* observed that the considerations relevant to determining the scope of employer liability for a supervisor's harassment include Title VII's deterrent purpose of "encourag[ing] employees to report harassing conduct before it becomes severe or pervasive*." Ellerth,* 524 U.S. at 764.

*Alalade v. AWS Assistance Corp.,* 796 F. Supp. 2d 936, 945 (N.D. Ind. 2011).

58.     Contrary to the policy behind Title VII, by requiring proof of those three elements in order to corroborate a complaint of racial harassment as a prerequisite to remedial action, the University makes it pointless to report racial harassment *until after it has become severe or pervasive,* since proof of that element, and others, is required under the NDP.

59.     The University is aware that its NDP is toothless to prevent or address harassment. In a recently published report discussed below, the University acknowledged that its anti-harassment standard "closely parallels the standard that would applying a civil damages action . . . *Thus, if the University could act only in cases where the actor's conduct satisfied this standard, it would be powerless to intervene until the actor's conduct had exposed the University to civil liability."*

60.     Also, if the victim waits to report the harassment until it has become severe or

pervasive, the University may be permitted under Title VII to escape liability if it can show the alleged victim unreasonably failed to *timely* utilize an available complaint procedure under the NDP.

61.     In addition, since all three elements must be proved, the NDP *explicitly permits racial harassment* that is not objectively offensive, even if it is severe or pervasive.

62.     Even where the racial harassment meets the first and second elements, it is *still* not deemed a violation of the NDP, unless it interferes with the victim's ability to participate in or benefit from his or her employment (i.e., perform his or her job). For example, the NDP would permit a supervisor to address black subordinates as n*gers, or menace them with a hangman's noose, so long as the subordinates are able function on the job. Class members who need to feed families will put up with a lot. By the time they are no longer able to function, they may have suffered permanent harm.

63.     The University requires that criteria (1) through (3) be proved by the "preponderance of the evidence" standard, which requires that the evidence offered to support his claim must be more convincing than any evidence offered to refute that claim. Congress intended that this standard apply in court—where the alleged victim has all of the rights and powers of a plaintiff—not in an employer's internal investigation where the employee has none of those rights and powers and the employer acts as judge and jury.

64.     Rather than furthering the goals of anti-discrimination laws, these policies favor racial harassment. They stack the deck against corroboration of complaints, which deters reporting and makes it unlikely that racial harassers will face consequences for their actions. Thus, these policies embolden racial harassers, and encourage others to follow their lead.

65.     In an OAE investigation controlled by the employer, the victim is dependent on the employer to review evidence primarily within its own control, and then reach a conclusion

whether the plaintiff was the victim of racial harassment. Evidence such as coworker interview notes or whether the alleged harasser has been the subject of previous complaints, and the outcome of OAE's investigation (if any), is not made available to the employee.

66.     By contrast, the Title VII plaintiff has the power of liberal discovery in court, to compel testimony and production of documents from parties and non-parties, and most importantly, the right to counsel. A neutral judiciary and applicable rules of evidence and procedure provide the plaintiff an opportunity to present all relevant admissible evidence to a neutral fact finder.

67.     As discussed below in Section I(C), no matter how overt the racial harassment, the University almost never finds that it violates the NDP.

68.     Title VII requires courts to consider the "totality of the circumstances," in determining whether the racial harassment is severe or pervasive, based on race, and/or objectively offensive. The NDP does not, which makes it even more difficult for an employee to receive a finding that the alleged racial harassment violated the NDP.

69.     The University typically looks at each individual harassing act in a vacuum, divorced from the totality of the circumstances.

70.     As a consequence, it concludes racially motivated harassment is not racially motivated because it ignores context.

   i.     <u>Class Representative Flemons' Experiences Demonstrate how the NDP Functions as an Actual Policy of Racial Harassment</u>

71.     During the relevant period, Class Representative Flemons was the only black Brick Mason in the Masonry Department in F&S at UIUC. He reported to Bruce Rogers. Rodgers began making offensive racial comments to Flemons in 2008.

72.     In or about April 2012, Rogers' prevented Flemons from attending a retirement party at UIUC, which he permitted Flemons' white coworkers to attend. In ordering Flemons

11

back to work, Rogers told him, "get your ass in the van" and patted the seat.

73.     Following this incident, Flemons had a meeting with a Human Resources representative, Bruce Rogers, and Rogers' supervisor. Flemons stated that he felt Rogers was harassing him and that he treated him differently than his white coworkers. He described how Rogers humiliated him, while allowing his white coworkers to attend a retirement party. Human Resources took no action and the racial harassment continued.

74.     In May 2012, Flemons reported to the University's OAE department at UIUC that Rogers had racially harassed him for years. Flemons told OAE that Rogers had suggested that Flemons was only hired for diversity reasons and named white workers he would have hired over Flemons; referred to Flemons as a "big black guy" in Flemons' and a white coworker's presence when assuring someone on his phone that he had sufficient manpower; implied Flemons and his son had a genetic predisposition to stupidity; and frequently yelled and cursed at Flemons in front of his coworkers, disparaged his skills, and excessively scrutinized his work and daily movements, among other harassment. Rogers did not treat white workers this way.

75.     Pursuant to University policy, it did not investigate Flemons' claims, but instead engaged Flemons and Rogers in "informal dispute resolution" or "mediation," which was not designed to determine whether Rogers had racially harassed Flemons and what remedial action was necessary.

76.     Although Flemons had complained to OAE about all of Rogers' racial harassment, as summarized above, during the mediation, OAE focused almost exclusively on only one of Rogers acts of harassment (i.e., Rogers' preventing Flemons from attending the retirement party in a disparaging, offensive manner).

77.     During the mediation, which was led by OAE Senior Associate Director Kamilyah Abdullah-Span and included Flemons, Rogers, and an F&S human resources

representative, Rogers volunteered that he had only hired Flemons because he was forced to for "diversity reasons." This statement was not made in response to a question such as, "is it true you told Flemons you only hired him to comply with diversity requirements." Rogers volunteered it to support his position, that his alleged harassment was actually valid performance criticism.

78.      The mediation failed to resolve Flemons' dispute with Rogers. In fact, it made it clear that Rogers was biased against black employees and thought nothing of disparaging Flemons based on his race. Rogers racially disparaging "diversity" comment during the mediation suggested that he did not believe (or care) that he was violating the NDP, since he said it in front of the second ranking manager of the University's OAE department at UIUC. Any reasonable person in Flemons' situation would have left the mediation wondering whether Rogers could make any racist statement he wanted without consequence.

79.      After repeated complaints to OAE that Rogers was still treating him the same as he had before the mediation, Flemons spoke to a colleague at F&S who informed him that he had the right to ask for an investigation—something OAE never told Flemons.

80.      In July 2012, Flemons requested that OAE investigate Rogers' racial harassment.

81.      In January 2013, OAE issued its Report on the investigation.

82.      Rogers admitted to several of Flemons' complaints, including calling him a "big black guy."

83.      Notwithstanding that Rogers volunteered the racially derogatory "diversity" comment in front of OAE Senior Associate Director Abdullah-Span, and the obvious inference that was due such a statement, the University determined that Rogers' conduct did not violate the NDP.

84.      The University determined that Rogers' "big black guy" comment, alone, was not

severe or pervasive. The Report simply ignored Rogers' other racial insults and disparaging treatment, which were evidence of pervasive racial harassment. Rather than consider the totality of the circumstances, it looked at the "big black guy" comment in a vacuum and simply ignored the "diversity comment." See infra Section I(C)(iii) (detailing that the University conducts bad faith investigations, ignores material evidence, and refuses to consider the totality of the circumstances during harassment investigations in order to avoid making discrimination findings).

85.     The University concluded Rogers' other mistreatment was not motivated by race, by walling off his "big black guy" comment. This statement, along with the "diversity" comment, implied Rogers was biased against blacks—an implication further supported by the fact that Flemons was the only black employee reporting to Rogers at that time.

86.     Rogers evident bias should have provided the context to understand that his constant belittling of Flemons was racially motivated. The same is true of his stereotyping Flemons and his son as stupid. In that context, the University should not have struggled to credit Flemons' complaint that Rogers abused him due to his race.

87.     Because the University found that Rogers' conduct did not violate the NDP, he continued to racially harass Flemons. As a consequence, Rogers' subordinates began to follow his lead, and began calling him racial stereotypes, such as "lazy."

ii.     <u>Class Representative Derick Brown's Experiences Demonstrate How the NDP Functions as an Actual Policy of Racial Harassment</u>

88.     Plaintiff Derick Brown worked in the Machine department in F&S at UIUC where he was the only black employee. He has worked at the University as a Machinist since 2006. On at least three occasions beginning in late-2016 or early-2017, Brown complained to Assistant Superintendent of Operation Maintenance Ken Bunting, and Associate Director of Operations, Maintenance, and Alterations Dave Bang—both in F&S management at UIUC. Brown

14

complained that his supervisor, Chris McCoy, called him "boy," "lazy" and "stupid," insulted and demeaned him, saying "after thirteen fucking years you should know how to do your job by now," gave him menial assignments, and did not treat his white coworkers in the same way. He complained that when McCoy assigned him menial tasks, such as cleaning, his coworkers would tease him for not doing real mechanical work. Brown reported that when three of his relatives died in 2016, McCoy said, "I hope they get another coffin for you, that way you won't come back." By contrast, Brown told Bunting and Bang, that when a white coworker experienced the loss of a relative, the entire Department signed a sympathy card, which McCoy gave the bereaved coworker.

89.    In his third complaint, Brown told McCoy's supervisors that in August 2015, Brown's coworkers taunted him by fashioning a rag with eyes and mouths holes cut out to look like a Ku Klux Klan hood, and that McCoy laughed when he witnessed this.

90.    McCoy's racial harassment continued.

91.    In August 2017, Brown reported the racial harassment to the University's OAE department at UIUC.

92.    Brown identified a contractor, James Taylor, who did not work for the University or report to McCoy, who had witnessed the Klan threat.

93.    Taylor corroborated Brown's account of the KKK incident in an interview with OAE. Taylor provided Brown with an affidavit signed before a notary on August 31, 2017. It stated that:

> The incident that happened at the transfer recovery faculty. I was a witness to an occurrence that involved a U of I employee (machinist). exhibited following: the U of I employee placed a rag cut out with eyes and mouth to represent the KKK. My fellow employee, Kendrick Pratt (deceased) also witnessed this occurrence, and he also took pictures his cell phone. The U of I employees was laughing, they thought it was funny.

94.     After signing, he wrote "P.S. any questions, contact me at," and provided two phone numbers. Below that, he drew this:



95.     During OAE's investigation, McCoy admitted telling Brown "after thirteen fucking years you should know how to do your job by now."

96.     Every witness that OAE interviewed corroborated the fact that McCoy yelled at Brown and disparaged his work.

97.     McCoy initially denied to the OAE investigator that the Department gave Brown's white coworker a condolence card, but later recanted, and admitted signing it himself.

98.     A coworker told OAE that McCoy said to Brown he would be in "a coffin like his family who passed away," if he did not eat better.

99.     OAE issued a Report on its investigation, dated October 5, 2017. OAE acknowledged in pertinent part that

> [i]t was clear from witness testimony and. by Mr. McCoy himself that he degrades Mr. Brown and allows for coworkers to bully him.

> During the interview process it became exceedingly apparent that there is racial tension between the employees who identified as Caucasian and other African American employees in the larger Facilities and Services department as a whole. As Mr. Brown is the sole African-American employee in his area, it will be important that his department understand this dynamic of tension in moving forward in a productive manner. A s such, it is the obligation of the supervisor to be the role model for civility and Mr. McCoy has failed in this role.

100.    OAE stated: "This report is private and confidential, it is not be shared or circulated to others except as necessary for implementing recommendations."

101.    The Report explained how the University found that none of the conduct about which Brown complained violated the NDP.

102.    Regarding the Klan threat, in spite of the fact that Brown's account was directly corroborated by at least one witness, the University determined that Brown's evidence did not meet its preponderance of evidence standard—i.e., that Brown's evidence did not make it more likely than not that the incident actually occurred.

103.    OAE noted in Brown's report:

. . . [E]ven with all things being true in favor of the Complainant, the evidence does not rise to the legal standard for establishing Mr. Brown's harassment claim that he was subjected to unwelcome physical conduct because of his race (Black). In the case at hand, there was insufficient evidence to demonstrate the existence of a KKK-style mask.

104.    For the University to reach the conclusion that it was more likely than not that the KKK incident did not happen as Brown explained, it either ignored Taylor's corroborating evidence altogether and/or summarily determined the white employees who denied seeing the mask—who reported to McCoy, and included the employee accused of donning the mask—were more credible than black witnesses, Brown and Taylor. See infra Section I(C)(iii) (detailing the University's pattern or practice of conducting biased and/or bad faith investigations by ignoring material evidence and treating black complainants as untrustworthy).

105.    The University also concluded that McCoy's treatment of Brown was not race based—despite evidence of McCoy's racial animus, e.g., McCoy laughing along during the KKK incident and that he referred to blacks as "boys" (which OAE simply ignored).

106.    In the context of McCoy's admissions, corroborating witness accounts, and the University's own findings about the nature of McCoy's treatment and the overall racial climate in F&S, a reasonable conclusion would be that is was more likely than not that McCoy's conduct was race based. However, the University avoided this conclusion by refusing to consider the totality of the circumstances. Instead, it disaggregated and decontextualized patterns of

harassment in order to reach conclusions that it could not reach had it evaluated the complaints in context. See infra Section I(A)(iii) (discussing the University's policy of intentionally avoiding making racial harassment findings by refusing to consider the totality of circumstances during racial harassment investigations).

107.    The University's investigation into Brown's complaints is typical of its pattern or practice of intentionally avoiding finding that racial harassment constitutes a violation of its NDP.

    iii.    <u>The Experiences of the Complainants Detailed in an OAE Report Published Online in October 2018 Demonstrate how the NDP Functions as an Actual Policy of Harassment</u>

108.    In October 2018, a published OAE report detailed the University's findings from an investigation into multiple complaints that a professor at the University College of Law sexually harassed female faculty members and students—by repeatedly touching women inappropriately, including on their buttocks, thigh, knee, and arm; attempting to hug women—despite clear protest;  asking women about sexual practices, relationship status, and habits; talking about his sex life, sexual fantasies, and masturbation; asking women to stay at his apartment; and engaging in other sexually offensive conduct.

109.    The Report detailed how the allegations of the three primary complainants were directly corroborated by numerous witness accounts of touching, comments, overtures, and other highly offensive sexual conduct.

110.    The Report acknowledged that much of the underlying behavior in the complainants' witness's accounts was admitted, and that the accused had also been the subject of prior sexual harassment allegations. Upon information and belief, at least two of which occurred while the accused was employed by the University, and one of which had been made to the same OAE investigator that received the three subsequent complaints.

111.    OAE admitted that the "actions certainly have made the working and teaching environment uncomfortable for a countless number of female colleagues and students," and that he "likely will continue" his sexual misconduct.

112.    Nonetheless, the University concluded that the accused did not violate the University NDP.

113.    While the published OAE report deals with sexual harassment, it is the University's single policy of permitting harassment in violation of Title VII and ICRA, which is responsible for the illegal harassment described in the report, and in this Amended Complaint.

**B.    OAE is Infected with Racism**

114.    The University of Illinois at Urbana–Champaign, or more commonly "ILLINOIS," is the flagship state university campus. It is the largest and most prestigious of the three campuses, employing and educating more people than the other campuses combined.

115.    The Senior Officer of the University's OAE department at UIUC, Director Heidi Johnson, herself racially harasses her black subordinates, and is at once the primary arbiter and a beneficiary of the University's threshold for permissible racial harassment under the NDP

116.    Following Johnson's lead, several members of UIUC OAE leadership similarly have engaged in racial motivated mistreatment of black OAE employees.

117.    The University cannot ensure its compliance with anti-discrimination laws when it permits OAE senior leaders regularly to engage in the same conduct the office is charged with preventing and correcting.

118.    The University therefore has a powerful motive to find that conduct does not rise to the level of a violation of the University's NDP.

119.    From 2012 to 2016, at UIUC, the University did not make a single finding that harassment of an employee constituted a violation of the NDP.

120.     Former UIUC OAE employee Phyllis Tate repeatedly questioned the University's determinations because oftentimes there was evidence that would support a finding of discrimination. In response, Senior Associate Director Abdullah-Span would say things such as, "*the bar is very high*," or "*the bar is so high that it is very hard to show discrimination*." The "high" standard required show harassment under the NDF is oft-repeated mantra of the University. *See, e.g.,* OAE's Report on Plaintiff Brown ("While the conduct attributed to Mr. McCoy does not meet the *high standards* needed to state a claim for racial harassment under the campus' nondiscrimination policy, the evidence obtained does show a gross violation of the spirit of the University's Code of Conduct policy"); OAE Report Published Online in October 2018 ("While the conduct attributed to [the accused]. . . does not meet the *high standards* needed to state a hostile environment harassment claim for individual complainants under University policy, the collective evidence gathered during the investigation revealed a pattern and practice by [the accused] . . . of engaging female students and junior female colleagues in a manner that he knew or should have known would make them feel uncomfortable and was highly inappropriate for a workplace or academic setting. Through this conduct, [the accused] . . . certainly violated the spirit of the University's nondiscrimination policy, as well as its Code of Conduct.").

121.     UIUC OAE Director Heidi Johnson has personally harassed and discriminated against class members who have worked under her in OAE.

122.     By way of example and not limitation, OAE Director Johnson told class member Kim Otchere, Program Director for Social Justice and Leadership Education, that she was not hired into a position at OAE for which the search committee recommended her as the preferred candidate because Otchere "only had experience working with students of color," and Johnson wanted a candidate who had "experience working with the majority population on campus,"

which is white.

123.    Johnson ultimately hired a less qualified white candidate over Otchere.

124.    By way of further example, Johnson referred to two black employees, including class member Phyllis Tate, as the "rowdy crowd" when introducing them to a white employee from another department. Ms. Tate understood that Ms. Johnson stereotyped the two women as "rowdy" because of their race, an inference which became clearer when Johnson went on: "Two more from the rowdy crowd are on the way." While there were several OAE employees still on the way, only two were minorities.

125.    As a further example, Director Johnson has referred to class member Giraldo Rosales as "angry" on more than one occasion. Rosales and Tate (who also heard Johnson make these comments about Rosales) interpreted Ms. Johnson's remark to be a derogatory stereotype: that Rosales is an "angry" black man.

126.    Following Johnson's lead, several other members of UIUC OAE leadership similarly subjected black employees to worse treatment than their white colleagues.

127.    UIUC OAE Senior Associate Director Kamillyah Abdullah-Span subjected Phyllis Tate to years of racially-motivated mistreatment, including but not limited to regularly talking to Tate as if she were stupid, policing her "tone," and making negative comments about her attire and appearance.  On one occasion, Abdullah-Span sent Tate an email with a link to a clothing retailer with the subject, "dress for the job you want;" on another occasion, she asked Tate if she bought her clothes at a secondhand store. Tate dressed in professional business attire, the same as white employees who were not mocked or demeaned for their attire.

128.    Senior HRIS Specialist Andrew Hagler would regularly ignore Tate, be vocally dismissive of her ideas when they worked on group projects, and often refused to respond to her when she said hello or goodbye. He did not treat white workers this way.

129.    When several members of OAE, including Tate, Abdullah-Span, Johnson, and Hagler went to a University-wide meeting to discuss the rollout of a project on which Tate worked, Hagler removed Tate's chair from the OAE table. Tate was forced to sit in the back of the room instead of with her colleagues. When she complained to Abdullah-Span about Hagler's conduct, Abdullah-Span insinuated that Tate was not presentable enough to sit with the OAE staff.

130.    Director Johnson condoned this behavior through her own similar actions towards Tate and other black employees, and often appeared amused to watch Abdullah-Span and other staff harass Tate and other black employees.

131.    For example, in September 2015, Tate gave a presentation to the entire UIUC OAE office, including Director Johnson. Throughout the presentation, Abdullah-Span rudely interrupted Tate and arbitrarily dismissed her work.  At one point, Tate looked over to director Johnson for assistance in reigning in Abdullah-Span so she could finish her presentation. Johnson just smirked and allowed Abdullah-Span to continue her sabotage of Tate's presentation.

132.    As a further example, when a putative class member reprimanded a white subordinate employee, Hope Daniels, for frequently yelling at her and speaking in a disrespectful manner, Johnson rushed out of her office and scolded the class member, but said nothing to Daniels. This has been common behavior for Johnson; she has often made excuses for white employees when they fell behind on assignments, or justified misbehavior by white employees, while holding class members Tate, Rosales, and other class members to much more exacting standards.

133.    The biased leadership of and the problems with racial bias within OAE are reflected in its work, as discussed in Section C, below.

134. Class members at UIC are deterred from reporting harassment that they experience because they understand OAE is merely a vehicle to protect the University—not a department designed to ensure that UIC employees are free from harassment.

**C.    The University has a Pattern or Practice of Not Finding that Racial Harassment Violates its Nondiscrimination Policy, which Effectively Licenses Racial Harassment**

135. Rather than making a bona fide effort to comply with anti-discrimination law, the University's OAE and Human Resources departments, along with Senior University leaders, methodically ignore or are dismissive of complaints of harassment; fail to initiate investigations into credible complaints of racial harassment; and/or conduct biased and/or inadequate investigations by ignoring material and/or corroborating evidence, failing to consider the totality of circumstances of racial harassment complaints, and treating the word of black witnesses as fundamentally untrustworthy while trusting statements of white witnesses, including alleged harassers.

136. As a consequence, harassers go unpunished and continue to engage in racial harassment. The University neither deters harassers nor provides reasonable avenues of redress for victims.

137. The practical effect is that the University knowingly permits racial harassment.

i.    <u>Racism is Ignored, and Victims are Punished for Complaining, from the Top Down</u>

138. University officials at the highest levels, including University President Timothy Killeen, the former-Interim Chancellor at UIUC, Barb Wilson, and UIUC Chancellor Robert Jones have ignored explicit complaints of racial harassment, and have discouraged employees from making complaints.

139. By way of example only, beginning in 2014, the Associate Director of F&S Human Resources at UIUC, Melvin Boatner, emailed President Killeen, former interim UIUC Chancellor Barb Wilson, and UIUC Chancellor Jones, among other University leaders, dozens of

complaints concerning specific examples of racial harassment, discrimination, and retaliation of which he was aware as a result of his human resources position, or which he personally experienced. Mr. Boater continued to send complaints as the racism in F&S continued to occur. He repeatedly questioned President Killeen and senior leaders at UIUC why despite his complaints, the University did not take appropriate remedial action to address the racial issues about which he brought to their attention. Despite Boatner's complaints, racial conditions in F&S grew worse.

140.    For example, despite that Boatner made several complaints about the lack of diversity in hiring in F&S and identified specific positions where the University refused to hire qualified black candidates to open positions, the University permitted the F&S Executive Management Team to remove Boatner (and the entire F&S Human Resources department) as voting members on candidate search committees. This decision compounded the diversity issues about which Boatner complained in the first place since F&S Human Resources was in the best position to understand the diversity shortcomings of the department. As Boatner explained to President Killeen and Chancellor Jones by email, dated January 16, 2015: "This change basically eliminates any chances of a minority candidate getting selected during the search process, because the search committees are stacked with nonminority employees who historically have not been inclined to select a minority candidate. These committee members haven't been directed to select a minority candidate either, even when one is available and meets all of the qualifications."

141.    On March 2, 2016, Boatner sent an email to President Killeen and former interim UIUC Chancellor Wilson wherein he explained in detail several examples of how black F&S employees are subjected to discrimination in F&S, including specific examples of discrimination in hiring, promotion, salary, and discipline. Boatner also explained several other issues that

contributed to the racist culture in F&S, including identifying six individuals who committed discrimination and explaining that ODEA is simply protecting the University and not working in good faith with those affected by discrimination. Boatner provided several suggestions about how the University can begin to address the racism in F&S. Following his email, former interim Chancellor Wilson encouraged Boatner to meet with the Human Resources Assistant Vice President, Eric Smith, to "follow up" on the issues Boatner raised in his email.

142.    Rather than "follow up" with Boatner in good faith, on March 8, 2016, Eric Smith sent Mr. Boatner an unsubtle hint to stop making complaints. Smith told Boatner: "If you continue to want to blow things up, where do you think you are going to work."

143.    Because Boatner had sent several complaints directly to President Killeen and interim chancellor, including a detailed list of examples of discrimination in F&S just days prior to meeting with Smith, Boatner reasonably believed that Smith's warning came directly from the President and/or the interim chancellor.

144.    Despite Smith's warning, Boatner continued to oppose harassment and discrimination, providing notice directly to senior leadership at the University, including to President Killeen.

145.    University leadership discouraged him from complaining to President Killeen or the campus Chancellors. For example: (1) in June 2016, Interim Chancellor Barb Wilson instructed Boatner that he was to send his complaints to F&S Interim Executive Director Helen Coleman, not herself or President Killeen; (2) in August 2016, Coleman sent Boatner a letter in which she admonished him for continuing to complain to President Killeen and instructed him that he should direct complaints to herself; and (3) in August 2017—less than three months after Boatner filed a Charge of Discrimination with the EEOC— Director of Safety and Compliance Maureen Banks sent Boatner a Letter of Expectation, placing Boatner on a 60-day probation

after which time she would reevaluate his employment with the University, at least in part, because he continued to complain to the President, Chancellor, and Board of Trustees instead of Interim F&S Director Coleman.

146.    In April 2017, Boatner sent an email to President Killeen and Chancellor Jones, which included dozens of examples of how discrimination in F&S was growing worse despite his complaints. Boatner explained to Killeen how, when he mentioned the same concerns to the Director of F&S at the time, Helen Coleman, and asked her why nothing was being done she responded: "If I choose to do nothing, then I am choosing to do something."

147.    Neither Killeen or Jones responded. The harassment, discrimination, and retaliation continued in F&S.

148.    By letter dated August 28, 2017, Boatner notified President Killeen and Chancellor Jones that because of his ongoing opposition to racial discrimination, his department heads were retaliating against him, including threatening to fire him within 60 days.

149.    Neither Killeen nor Jones responded.

150.    Shortly thereafter, Boatner suffered a stroke at work. Director Banks—the supervisor about whom Boatner complained in his August 2017 letter—along with Executive Director Coleman and Assistant Vice President Eric Smith—failed to call for medical help, although they recognized the symptoms of a stroke. While he was on the floor crying, Smith commented, "he seems coherent, so he must be okay." Coleman added: "You know, if you aren't feeling well, you can go home." Then Smith, Banks and Coleman simply exited the room, without notifying anyone.

151.    Boatner eventually managed to get into his car, and drive home, but it was several more hours before he received medical care. As a result of the delay, he suffered permanent neurological damage.

152.   Based on information and belief, Director Banks, Executive Director Coleman and Assistant Vice President Smith acted out of a retaliatory motive in refusing to summon medical help, and abandoning Boatner.

153.   Boatner's experience with executive-level retaliation is not unique at the University. In August 2017, then-UIUC OAE Affirmative Action Coordinator Giraldo Rosales complained directly to President Killeen and Chancellor Jones that less than three months after he filed a Charge with the EEOC concerning, *inter alia,* racial harassment and retaliation that he experienced in OAE, Director Johnson issued him a demonstrably biased performance evaluation and recommended that his employment contract be terminated. In the 27 years prior to this evaluation, Rosales had never been evaluated so poorly.

154.   Rosales had no choice but to complain to Killeen and Jones because the conduct about which he complained was perpetrated by the Director of the only department designated by the University's NDP to receive such reports.

155.   That fact that OAE employees effectively had no outlet to complain was not lost those in OAE's leadership who committed racial harassment. For example, when class member Phyllis Tate complained to Abdullah-Span about her own and Director Johnson's mistreatment of her (discussed below in Section C(ii)(e)), Abdullah-Span told Tate she had no recourse, stating OAE is "the office that handles complaints; I'm not sure if anyone here has a complaint where they will go."

156.   Neither Killeen nor Jones responded or took action to protect Rosales.

157.   The University's Board of Directors approved Director Johnson's recommendation to terminate Rosales' employment contract.

158.   Director Johnson was not disciplined for her racial harassment and/or retaliation against Rosales.

159.     President Killeen's, Interim-Chancellor Wilson's, and Chancellor Jones' conduct is an expression of the University's actual policy of discrimination, and signals to other University decision makers that they, too, can ignore complaints of racial harassment.

ii.     <u>The University's Human Resources and OAE Departments Ignore Racial Harassment Complaints and Refuse to Initiate Investigations.</u>

160.     Following the example of the University's senior leadership, including President Killeen, the University's primary units that are designated to ensure compliance with anti-discrimination law also maintain a pattern or practice of simply ignoring complaints of discrimination and/or refusing to initiate investigations into complaints.

161.     By ignoring complaints or refusing to initiate investigations, the University is able to turn a blind eye to the racism at the University, harassers are free to continue their unlawful conduct, and aggrieved class members are afforded no protection.

a.     *OAE and Human Resources ignored Terry Smith's complaints of racial harassment*

162.     Class member Terry Smith is a black former Building Services Worker at UIUC who in 2016 and 2017 experienced repeated racial harassment, such as being called "boy," lazy," and "worthless," including by his Foreman, Mike Watson.

163.     As Smith stated under oath:

After Watson cursed me out, I complained to human resources that Watson was racially harassing me, but when HR held a meeting about the incident, the focus was only

Watson's criticisms of my work performance and not on his treatment of me. Following my complaint to human resources, I complained to [the University's] ODEA [department at UIUC] in the summer of 2016 about Watson's treatment of me. I specifically told ODEA that I felt I was being racially harassed.

The investigator I talked with in ODEA did not investigate my complaint or take any action that I am aware of, and I did not otherwise hear back from ODEA following my complaint. She just told me that my Foreman is allowed [to] reprimand and/or discipline me.

Following my meeting with ODEA, Watson intensified his racial harassment and

discrimination against me.[2]

164.    Smith again complained to OAE in March 2017. OAE still refused to investigate:

I spoke with the same investigator in ODEA that I spoke with when I complained in the summer of 2016. She told me that she remembered me.

I complained specifically that I was being racially harassed by Watson, and retaliated against for complaining about harassment.

The investigator defended the Building Services department and again told me that my Foreman is allowed to discipline me and that it was not racial harassment.

I asked the investigator how it could not be considered racial harassment when I am the only African American in the hall and no one else was being treated this way.

To the best of my knowledge, ODEA took no action and did not investigate my complaints.

I have not heard anything from the ODEA department regarding my complaints of racial harassment and retaliation.

165.    Smith's Forman, Watson, and another supervisor gave Smith numerous unfounded writeups. Because of his write ups, the University placed him on administrative leave without pay. When he returned to work following the leave, in or around April 2017, the harassment and discrimination intensified, and ultimately culminated in Smith's termination.

> b.    *OAE does not investigate Plaintiff Flemons' complaint of confederate flags at his workplace*

166.    On June 27, 2017, Class Representative Flemons emailed UIUC OAE Director Johnson to report that he had been seeing a vehicle bearing confederate flag images in an employee-only University parking lot. Flemons identified himself as an employee. Pursuant to the University's Nondiscrimination Policy, OAE was the proper organization to receive his complaint.

---

[2]      Declaration of Terry Smith dated October 17, 2017, ¶¶10-13

167.    Flemons attached several images of the vehicle and its location, including the following:

 

168.    Johnson replied via email that someone from a student-focused organization would be in touch, but no one ever contacted him or otherwise followed up on his complaint.

169.    As of the time of this filing, Flemons was unaware of any investigation into his complaint.

c.    *OAE at UIC ignored class member Dolores Spraggins' complaints of discrimination*

170.    Class member Dolores Spraggins is a black Driver in the Motor Pool at UIC.

171.    Ms. Spraggins started working at the University in 2012.

172.    The University subjected her to racial slurs, including the N word, and racially offensive mistreatment for years.

173.    By way of example and not limitation, within the first week of her employment, Ms. Spraggins heard her supervisor, Sub Foreman Rich Riddle, use the N word during a conversation with a white employee.

174.    Spraggins coworker, Frankie Lamatto also frequently used the N word and made racially derogatory remarks directed at and in Ms. Spraggins' presence. She complained about Lamatto's use of the N word to her supervisor, Riddle, on numerous occasions over the course of several years. Despite her complaints, Lamatto continued to use the N word without consequence. Riddle never informed OAE as required or otherwise took any adequate remedial measures.

175.    In addition to racial slurs, Ms. Spraggins' supervisor, Transportation Manager Bob Witas, subjected her to race-based treatment with respect to several aspects of her employment, including denying her scheduling priority in favor of white employees with less seniority than she had, refusing her request to work on the day shift so that white workers could work on the day shift instead, and denying her overtime compensation when she worked overtime.

176.    In September 2018, Ms. Spraggins called the UIC OAE office to report the discrimination that she was experiencing. She explained to an investigator that she was being discriminated against with respect to scheduling, shift assignments, and overtime compensation. The investigator told Ms., Spraggins to put her complaints in writing and that OAE "would take it from there."

177.    As requested, Ms., Spraggins emailed the investigator a written complaint explaining in detail the discriminatory employment decisions she endured and expressly indicating that she was experiencing discrimination.

178.    Ms. Spraggins called and left messages for the investigator requesting a status update every week for three consecutive weeks after she emailed her complaint. Ms., Spraggins never heard from the investigator or anyone else in OAE again.

179.    In accordance with the University's pattern or practice of intentionally avoiding

finding that conduct violates the University NDP, OAE simply ignored Ms. Spraggins' detailed, explicit complaint of discrimination.

180.    OAE never investigated Ms. Spraggins' complaint.

> d.    *OAE at UIC failed to initiate an investigation into Class member Chuck Conner's complaints of harassment and discrimination*

181.    Class member Chuck Conner is a black Garage Foreman in the Motor Pool at UIC.

182.    Throughout 2016 to present, Conner's supervisors and white coworkers subjected him to racial harassment, including, *inter alia,* violent physical threats and intimidation; racial slurs, stereotypes, and comments, such as being subjected to use of the words: n*gger, monkey, boy, and Aunt Jemima, among other racially offensive language; and degrading race-based conduct and treatment.

183.    The University was aware of the systemic racism in the Motor Pool because Conner complained to his supervisors, UIC management, and OAE about several of the racial issues he endured.

184.    Moreover, in late-2015, Conner and the University reached an agreement intended to resolve prior racial harassment, discrimination, and retaliation that Conner experienced while working in the Motor Pool at UIC. The individuals who perpetrated and condoned the racial harassment that formed the basis of Conner's prior matter, remained employed at the University and the University took inadequate steps to protect Conner from further racial harassment.

185.    In spite of the December 2015 agreement, Conner's supervisors and white coworkers continued to subject him to increasingly hostile racial harassment.

186.    One of the supervisors in the Motor Pool Garage where Conner worked, Sub Foreman, Rich Riddle, regularly made racist remarks directed at or in the presence of Conner. By way of example and not limitation, on one occasion, after Riddle had a disagreement with a

black employee, he approached Conner and asked: "Are all black people this ignorant?  I want to know, is it something I'm saying? Do all black people do this?"

187.    Riddle also regularly commented on how a group of black employees conducted themselves, and often referred to them as "ignorant bitches" or "stupid bitches."

188.    In January 2018, Riddle instructed Conner to release a vehicle that he was working on but that had not yet passed a safety inspection. Conner cannot release vehicles without the required safety inspection, which he explained to Riddle. Had Conner released the vehicle without the required safety inspection, he would have been subject to discipline.

189.    Riddle became enraged that Conner would not follow his demand that he violate safety protocol. Riddle does not demand or otherwise pressure white workers to commit safety infractions.

190.    Riddle started yelling at Conner: "Go on and do your fucken job!" Conner told Riddle it was not necessary for him to talk to him that way. Riddle continued yelling at Conner: "Just do your fucking job!" Riddle does not direct abusive and/or profane language at white workers.

191.    Conner provided a written incident report regarding Riddle's conduct to the Associate Director of the Motor Pool, Pablo Acevedo. Upon information and belief, two other witnesses to Riddle's abuse of Conner also submitted incident reports, which corroborated Conner's account.

192.    Additionally, Conner called the OAE Executive Associate Director, Mike Diaz, to inform him that he filed an incident report regarding Riddle's racial harassment. Conner explained to Diaz that he felt Riddle's verbal abuse was racial harassment, and that Riddle's conduct was part of a continuing pattern of racial harassment against Conner that started before and did not end following the late-2015 agreement between Conner and the University.

193.   Diaz told Conner that he would relay the information to the Executive Director of Operations & Maintenance, Clarence Bridges, that they will make a decision about Riddle's conduct, and that he would make sure the situation is "taken care of."

194.   Diaz did not advise Conner to submit an additional complaint with his office. Diaz never indicated that OAE would not conduct an investigation into Conner's reports of Riddles' harassment or the ongoing pattern of racial harassment in the Motor Pool about which Conner complained.

195.   Neither Diaz nor Bridges ever contacted Conner again regarding his complaints.

196.   Conner learned that Riddle had a meeting with Bridges during which Riddle had a tantrum and blew up, and that as a result of his tantrum during the meeting with Bridges, Riddle was sent to anger management.

197.   Upon information and belief, the University did not discipline Riddle for his racial harassment of Conner.

198.   Conner's experience described above is typical of how the University treats black employees who make complaints of racial harassment. Under its pattern or practice of intentionally avoiding finding that harassing conduct violates the University NDP, the University failed to initiate an investigation into Conner's explicit reports of harassment.

199.   As a consequence of the University's failure to investigate Conner's reports of racial harassment, the University never disciplined Riddle or any of the other individuals who engaged in racial harassment in the Motor Pool.

200.   The University's refusal to hold those who commit racial harassment accountable serves as a tacit approval of their conduct, which emboldens harassers to engage in additional, often more intense harassment and signals to other employees that the University tolerates racial harassment.

201.    Accordingly, Conner and other black employees in the Motor Pool continued to experience racial harassment.

202.    By way of example only, less than two months after Conner complained of Riddle's racial harassment, Transportation Manager Bob Witas referred to Conner as a "monkey" in front of Conner's white coworker.

> e.    *Senior leadership in Human Resources and OAE were aware of racial harassment against class member Phyllis Tate, but took no remedial action*

203.    Phyllis Tate is a former UIUC OAE Human Resources Associate.  She reported to Director Johnson and Associate Director Abdullah-Span. Shortly after she started in OAE in 2012, and continuing into early 2016, Ms. Tate complained on several occasions, both orally and in writing, to UIUC OAE Director Johnson and Senior Associate Director Abdullah-Span about racial harassment Johnson and Abdullah-Span had directed against her.

204.    The University's NDP required Ms. Tate to report the racial harassment to her harassers: "Individuals who believe that a University of Illinois at Urbana-Champaign employee has subjected them to discrimination or harassment in violation of this policy should contact the Office of Diversity, Equity, and Access[.]"

205.    The NDP does not provide another option for employees working in the OAE, a defect of which OAE leadership is well aware. As OAE Senior Associate Director, Abdullah-Span reminded Tate while she was harassing her: "[OAE] is the office that handles complaints; I'm not sure if anyone here has a complaint where they will go."

206.    Unsurprisingly, none of Tate's complaints were investigated.

207.    Because nothing was done about her complaints, the racial harassment continued.

208.    Tate also complained to the Associate Provost of Staff Human Resources, Elyne Cole, on several occasions between 2013 and November 2015. Tate complained specifically that

she believed her race played a role in Abdullah-Span's and Johnson's treatment of her. When Tate would complain, Cole would ask Tate whether she could just "tough it out" or would come check on Tate in the OAE office. Tate provided Cole with a copy of a December 2015 EEOC Charge she filed, in which she detailed the harassment and discrimination that she experienced in OAE.

209.    Despite Cole's personal knowledge of the harassment against Tate, pursuant to the University's pattern or practice, Cole never initiated an investigation into Tate's complaints or otherwise took any meaningful action to help Tate. Accordingly, the discrimination and harassment against Tate continued.

210.    Ultimately, the harassment forced Tate to resign from her position in OAE in early-2016 because she found her workplace intolerably hostile.

iii.    <u>The University has a Policy of Not Conducting Bona Fide Investigations into Complaints of Racial Harassment.</u>

211.    When the University does initiate investigations, they are fundamentally flawed and/or biased against black complainants.

212.    University investigations are designed to support a single conclusion: that the alleged racial harassment does not violate the NDP. As OAE admitted in the report discussed in Section I(A)(iii), above:

> This sexual harassment standard closely parallels the standard that would apply in a civil damages action against the University for sexual harassment. Thus, if the University could act only in cases where the actor's conduct satisfied this standard, it would be powerless to intervene until the actor's conduct had exposed the University to civil liability.

213.    That is, to the extent the University determines that harassment violates its NDP, it admits it is also legally liable for the harassment. This is one reason the University did not made a single finding of a harassment violation of its NDP from 2012 to 2016. The University's OAE units are not independent, impartial fact-finding bodies. OAE's partiality towards the

36

University is also well known among class members, which often results in victims of racial

harassment simply choosing to endure the abuse rather than going to OAE for assistance.

214.    The University takes affirmative steps to ensure that investigations will not result

in a finding of a violation of the NDP, including by systematically disregarding material

evidence favorable to complainants; treating white employees as more trustworthy than black

employees, and evaluating evidence in the light most favorable to the alleged harasser, including

by refusing to look at the totality of the circumstances of harassment.

215.    Under this pattern or practice, the University ensures that complaints of

harassment will not be found to violate the University's NDP.

216.    As a consequence, harassers go unpunished and are permitted to continue their

mistreatment—often with greater frequency and intensity—and other employees realize there is

no risk in joining them.

### a.  Example: Jeffrey Taylor

217.    Class Representative Jeffrey Taylor filed a complaint with the University's OAE

department at UIUC in October 2017, alleging that several of his supervisors and coworkers in

the UIUC's Dining department racially harassed him and discriminated against him. Taylor

provided several examples of harassment, including being called the N word by a coworker,

having knowledge of his supervisor's use of the N word to Taylor's social media friend, and

repeated instances of his supervisors treating him worse than white employees, by yelling and

cursing at him, and excessively monitoring him and scrutinizing his work.

218.    In July 2018, OAE issued a report, in which the University concluded that Taylor

had not experienced racial harassment under the NDP.

219.    The University reached this conclusion by ignoring Taylor's complaints regarding

the use of the N word, ignoring corroborating evidence from Taylor's witnesses, and confining

its report to the actions of just one of Taylor's supervisors, Don Van Liew, despite that Taylor

had also complained to OAE about the actions of several of his supervisors and coworkers.

220.    Taylor reported two instances of his supervisors and coworkers using the N word,

including the following text message that Taylor received from a coworker, which he showed to

OAE:



221.    However, in accordance with its pattern or practice of ignoring material evidence,

Taylor's complaints regarding the N word in the workplace were entirely absent from OAE's

report.

222.    OAE also ignored and/or white-washed corroborating evidence concerning

supervisor Van Liew.

223.    OAE's report cited four accounts of the witnesses it interviewed, each of which

corroborated some of the conduct which formed the basis for Taylor's complaints against Van

Liew, and two of which directly corroborated Taylor's complaints of an overall racially hostile

environment in Dining.

224.    One witness, Briscoe Brown, corroborated Taylor's account of a racially hostile

environment in Dining, saying there is a "big race problem in Ikenberry [(where Taylor worked)] as well as in the rest of Dining Services," that the problem is manifest in the conduct of both management and non-management, and that he himself sought a transfer away from Ikenberry because of the racially hostile environment. OAE did not account for this directly relevant context in its report.

225.    Another witness, Executive Chef Carrie Anderson, reported to OAE that Van Liew repeatedly harassed Taylor because of his race, that she had not seen Van Liew treat white workers in the same way Van Liew treated Taylor, and described the overall racial tension in Dining, which Taylor and other black employees experienced.

226.    In its report, OAE explained how Anderson corroborated Taylor's account of Van Liew's underlying conduct; however, none of the racial context of Anderson's account is reflected in OAE's recitation of her interview. Considering that it was Anderson who encouraged Taylor to complain to OAE after witnessing several incidents of racial harassment against him, that the words "race" or "harassment" (or any variation thereof) are even mentioned in OAE's recitation of her interview demonstrates how the University's intention was not to conduct a good faith investigation into whether Taylor experienced racial harassment but to simply reach the conclusion that he did not.

227.    The fact that OAE simply ignored Taylor's evidence of use of the N word—which should be a *per se* violation of every employer's racial harassment policy—demonstrates that the University was primarily concerned with making a finding that there was no violation of the NDP.

    b.    *Example: Carrie Anderson*

228.    Class member Carrie Anderson filed a complaint with the University's OAE department at UIUC in or around December 2016, alleging that Dining Director Alma Dawn-

Aubrey (white) and several of her white subordinates harassed and discriminated against Anderson and other black Dining employees for years. Anderson explained at length how Dawn Aubrey referred to her as her "show pony," policed her tone, stripped her of job responsibilities, ostracized her within the management structure, paid her less than her white counterparts, transferred her, yelled at and belittled her, issued her negative employment evaluations, disciplined her, regularly treated black employees worse with respect to discipline and assignments, and was aloof to, attempted to conceal, and then tried to rationalize the drawing of a swastika in Dining (pictured above at para. 45), among other racial harassment and discrimination.

229. OAE investigated and interviewed seven witnesses—all but one of whom were white.

230. One witness, Housing Director Alma Sealine, who was actually Dawn-Aubrey's supervisor, directly corroborated Anderson's account of Dawn-Aubrey's race-based treatment, noting that Dawn-Aubrey was dismissive of women of color in authority positions.

231. Another witness also indicated that Dawn-Aubrey treats black employees worse than white employees with respect to discipline, attendance, and performance. This witness supported this observation, in part, by Dawn-Aubrey's callous response to a swastika that was found in a Dining facility in late-2016.

232. OAE issued a report in which the University concluded that Dawn-Aubrey's and others' conduct did not rise to the level of a violation of the NDP. It reached this conclusion by completely disaggregating Anderson's complaints of multiple incidents of racial harassment creating a hostile environment.

233. In its analysis, OAE considered just a single incident, Dawn Aubrey's reference to Anderson as a her "show pony," and found that the comment, on its own, was not sufficiently

severe or pervasive to violate the NDP. This conclusion is another example of how the University's NDP permits a threshold level of racial harassment, as described in greater detail in Section I(A), *supra*.

234.   Moreover, as OAE noted that during its investigation, Dawn Aubrey made "repeated efforts to besmirch Ms. Anderson's reputation and record by fabricating information about her despite documentation and testimony to the contrary." Despite OAE's acknowledgement of Dawn-Aubrey's lack of credibility and clear animus towards Anderson, it nonetheless credited her explanations of her treatment of Anderson so the University could conclude that Dawn-Aubrey's conduct did not violate the NDP.

235.   For example, Dawn Aubrey claimed that she used "show pony" in a complimentary manner towards Anderson and that she frequently used the term towards other workers. However, Dawn-Aubrey previously denied ever using the term when confronted about it by her supervisor Alma Sealine. Moreover, Dawn-Aubrey made this comment to Anderson following a meeting where she yelled at and belittled Anderson in front of several coworkers, demonstrating that Dawn Aubrey was not complimenting Anderson. Despite this evidence which is highly probative of guilty knowledge, OAE determined Dawn-Aubrey's explanation of her use of "show pony" as a compliment was "valid."

236.   OAE's failure to evaluate the totality of the circumstances surrounding Anderson's complaints of racial harassment, including her corroborating evidence, and OAE's credence to Dawn Aubrey's denials despite her lies and misrepresentations about her treatment of Anderson, are common policies the University employs to avoid making harassment findings.

237.   The University's determination on Anderson's complaints exemplify how its purpose was simply to conclude that Anderson did not experience racial harassment under the NDP, not to investigate her complaints in good faith to determine whether harassment occurred.

c.  *Example: Atiba Flemons' 2014 Investigation*

238.  In July 2014, Paul Rutledge, one of Flemons' white coworkers, racially harassed Flemons. Rutledge also lodged a baseless harassment complaint against Flemons.

239.  Flemons denied Rutlege's allegations and complained himself to OAE of Rutlege's racial harassment. OAE purported to investigate.

240.  Flemons had previously complained to OAE that he was subjected to racial harassment in his department from his supervisor and coworkers, including that he was subjected to the offensive stereotype that he was "lazy," as detailed in Section I(A)(i), above.

241.  Flemons reported to OAE that Rutledge made racial remarks such as calling him "a stupid fucking boot," which was an unsubtle shorthand for the racial slur "bootlip." Flemons provided witnesses who would have corroborated his allegations against Rutledge, had OAE asked.

242.  OAE did not interview any of Flemons' witnesses. Nor did it consider Flemons' prior complaint, or its own investigation of that complaint.

243.  The University concluded that "Rutledge [was] more credible" than Flemons, even though OAE admitted in its Report that "no-one saw firsthand or heard the words or gestures alleged by Rutledge."

244.  Notwithstanding Flemons' previous complaint that his supervisors and coworkers stereotyped him as "lazy," OAE parroted Flemons' white coworkers' derogatory stereotypes in its report. OAE stated that Flemons' coworkers described him as "lacking in work ethic and doing substandard masonry work." In contrast, OAE described Rutledge as a "good laborer . . . who just wants his work done well and efficient."

245.  OAE's statements about the work habits of Flemons and Rutledge had no relationship to Rutledge's allegations. The statement was superfluous and reflected the

University's bias against black employees' during investigations into complaints of harassment and discrimination.

246.    OAE made no mention of Flemons' allegations of Rutledge's racial harassment in the report and did not initiate a separate investigation to address them.

## II.    CLASS ACTION ALLEGATIONS

### A.    Class Definitions

i.    Issues Class Pursuant to Rule 23(c)(4)

247.    Plaintiffs seek to certify an issues class of all present and future black University employees, to determine whether the University maintains the policies and practices described in Section I, paragraph 47, herein.

ii.    Injunctive Relief Class Pursuant to Rule 23(b)(2)

248.    Plaintiffs seek an order certifying a class of all present and future black University employees, in order to obtain injunctive relief, including an order to prohibit the University from engaging in unlawful employment practices, and such additional affirmative action as may be appropriate under Title VII and ICRA.

iii.    Monetary Relief Class Pursuant to Rule 23(b)(3)

249.    Plaintiffs seek an order certifying a class consisting of all black University employees, excluding University employees and officers with authority to make policy concerning employment discrimination, from April 8, 2016 to present who have been or may be subject to the University's pattern, policy, and/or practice of creating and maintaining a hostile work environment based on race

250.    Each of the Class Representatives is a member of the proposed Classes.

### B.    Numerosity and Impracticability of Joinder

251.    The members of the proposed Classes are sufficiently numerous that joinder of all members is impracticable.

252.    Plaintiffs are informed and believe that the Classes may each consist of several hundred members during the liability period.

**C.    Common Questions of Law and Fact**

253.    The prosecution of the claims of the Class Representatives will require the adjudication of numerous questions of law and fact common to both their individual claims and those of the proposed Classes they seek to represent.

254.    The overarching common question for each class member is: Why am I subjected to racial slurs, symbols of racial violence, racial graffiti, and the other forms of racial harassment described herein, while white employees are not?

255.    Plaintiffs expect that the evidence will demonstrate a common answer: The standard operating policy of the University favors racial harassment of black employees.

256.    Common questions of law include, *inter alia*:

    a)    Whether the University, through its policies, practices, and/or procedures, creates and tolerates a racially hostile work environment to which black employees are subjected;

    b)    Whether the University has engaged in unlawful, systemic racial harassment against its black employees;

    c)    Whether the University is liable for a continuing systemic violation of federal anti-discrimination laws;

257.    The common questions of fact include, *inter alia*, whether, through its policies, practices, and/or procedures:

    a)    The University has maintained a racially hostile work environment for its black employees;

    b)    The University has subjected its black employees to racial harassment

44

and/or a hostile work environment based on race;

c)      The University's Senior leadership and/or departments and units tasked with enforcing its Nondiscrimination Policy, including the President, campus Chancellors, Department Directors, Human Resources, and/or OAE units were aware of and/or affirmatively contributed to the racial harassment;

d)      The University has engaged in a pattern or practice of failing to take prompt and effective action to stop the systemic racial harassment;

e)      Injunctive relief is warranted.

258.    The discriminatory employment policies, practices, and/or procedures to which the Class Representatives and the class members are subjected are created and enforced by the University and apply universally to all members of the Classes. These employment policies, practices, and/or procedures are not unique or limited to particular University campuses, departments, units, or employee classifications; rather, the policies and/or practices that give rise to and perpetuate the hostile work environment based on race apply to all black University employees.

259.    The University's discriminatory policies, practices, and/or procedures, therefore, commonly affect the Class Representatives and potential members of the Classes.

260.    Discrimination in the form of a racially hostile work environment occurs as a pattern or practice throughout the University and affects the Class Representatives and potential class members the same way:

The University creates and tolerates a racially hostile work environment for black employees in the form of, *inter alia*: racial slurs—including the N word, "monkey," and "boy"; racial symbols and imagery—including nooses, swastikas, racial graffiti, and

confederate flags; racially derogatory stereotypes, jokes, and language—including referring to black employees as "you people," "lazy," and "worthless"; mocking black employees' speech; claiming their only value is for forced "diversity"; physical threats; unwarranted and excessive scrutiny and monitoring of black employees' work and daily movements; and forcing black employees to perform menial and more arduous tasks compared to white employees.

**D.** **Typicality of Claims and Relief Sought**

261.    The claims of the Class Representatives are typical of the claims of the proposed Classes. The Class Representatives assert claims in each of the categories of claims they assert on behalf of the proposed Classes. The relief sought by the Class Representatives for racial harassment complained of herein is also typical of the relief sought on behalf of the proposed Classes.

262.    The Class Representatives, like the members of the proposed Classes, are black University employees who have been subject to the University's pattern, policy, and/or practice of creating and maintaining a hostile work environment based on race.

263.    Each of the Class Representatives and several members of the proposed Classes have complained about racial harassment, including by formal complaints to department Foreman, Sub-foreman, Directors, Supervisors, Human Resources, OAE departments, the EEOC, and/or up to and including the University President, Timothy Killeen, and/or UIUC Chancellors, Barb Wilson (former interim), and Robert Jones (current).

264.    The University's treatment of and response to these complaints have been inadequate, and Class Representatives and class members have been affected in the same ways by the University's failure to take adequate remedial measures to correct this pattern or practice of racial discrimination.

265.     The University has expressed its standard operating procedure of racial harassment by (1) maintaining a written Nondiscrimination Policy that allows racial harassment unless it is "sufficiently severe or pervasive," "objectively offensive," and "unreasonably interferes with, denies, or limits a person's ability to participate or benefit from employment opportunities, assessments or status at the University;" (2) through the actions of its senior leadership and its departments and units tasked with enforcing its Nondiscrimination Policy, including members of senior leadership who engaged in racial harassment without consequence; (3) through the pattern or practice of intentionally avoiding finding that racial harassment constitutes a violation of the University Nondiscrimination Policy by ignoring racial harassment complaints, failing to initiate investigations into complaints it acknowledges, and/or by conducting biased and/or bad faith investigations into complaints of racial harassment.

266.     Consequently, the claims alleged by the Class Representatives are typical of the claims of the proposed Classes. Each Class Representative has worked at the University during the liability period and has been subjected to the discriminatory policies, patterns, and/or practices alleged herein. The relief sought by the Class Representatives for racial discrimination is also typical of the relief which is sought on behalf of the proposed classes.

**E.     Adequacy of Representation**

267.     The Class Representatives' interests are co-extensive with those of the members of the proposed Classes they seek to represent, and the Class Representatives will fairly and adequately represent and protect the interests of the proposed Classes. The Class Representatives seek to remedy the University's discriminatory employment policies, practices, and/or procedures so that black employees will not be subjected to racial harassment.

268.     The Class Representatives are willing and able to represent the proposed Classes fairly and vigorously as they pursue their individual claims.

F.      **Efficiency of Class Prosecution of Common Claims**

269.    Certification of the Classes of black employees that are similarly situated to the Class Representatives is the most efficient and economical means of resolving the questions of law and fact common to the Class Representatives and the proposed Classes.

270.    The individual claims of the Class Representatives involve resolution of the common question of whether the University has engaged in a systemic pattern and/or practice of racial discrimination in the form of hostile work environment against black employees.

271.    The Class Representatives seek remedies to eliminate the adverse effects of such harassment in their own lives, careers, and working conditions, and in the lives, careers, and working conditions of the proposed class members.

272.    The Class Representatives seek to prevent continued racial harassment in the future.

273.    The Class Representatives have standing to seek such relief because of the adverse effect that such harassment has had on them individually and on the black employees who comprise the proposed Classes.

274.    To gain such relief for themselves, as well as for the members of the proposed Classes, the Class Representatives will first establish the existence of systemic racial harassment as the premise for the relief they seek.

275.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

276.    Certification of the proposed Classes of black employees who have been affected by these common questions of law and fact is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for the Class

Representatives, the proposed Classes, and the University.

**G.    Requirements of Rule 23(b)(2)**

277.    Claims for injunctive relief are properly maintained under Federal Rule of Civil Procedure Rule 23(b)(2) because the University has acted on grounds generally applicable to the Class Representatives and the proposed Classes by adopting and following systemic policies, practices, and/or procedures, which create and tolerate a hostile work environment on the basis of race, thereby making appropriate final injunctive relief or corresponding declarative relief with respect to the Classes as a whole an appropriate remedy.

278.    Racial harassment is the standard operating procedure at the University, rather than a sporadic or isolated occurrence.

279.    The University has refused to act on grounds generally applicable to the proposed Classes, *inter alia*:

    a)    by failing to provide a working environment that is free from racial hostility and harassment;

    b)    by failing to take reasonably effective measures to correct and remedy racial harassment.

280.    The University's systemic discrimination against black employees makes appropriate the requested final injunctive and declaratory relief with respect to the Classes as a whole.

281.    Injunctive and declaratory relief predominate over the other relief sought in this case because the injunctive and declaratory relief represent the culmination of the proof of the University's individual and class-wide liability at the end of Stage I of a bifurcated trial, and the essential predicate for the Class Representatives' and class members' entitlement to monetary and non-monetary remedies at Stage II of a bifurcated trial.

282.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic racial discrimination against black employees.

283.    Declaratory and injunctive relief are the factual and legal predicates for the Class Representatives' and the class members' entitlement to monetary and non-monetary remedies for individual losses caused and necessitated by such systemic discrimination.

## H.    Requirements of Rule 23(b)(3) and Rule 23(c)(4)

284.    The claims for monetary relief are properly certified under Rule 23(b)(3) because questions of law and fact common to the Class Representatives and the proposed Classes predominate over any questions affecting only individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case.

285.    Additionally, the cost of proving the University's pattern or practice of discrimination and retaliation makes it impracticable for the Class Representatives and members of the proposed Classes to pursue their claims individually.

286.    Alternatively, the issue of class-wide liability on the Title VII and ICRA claims under the theories advanced in this action are properly certified under Rule 23(c)(4) because such claims present only common issues, the resolution of which would advance the interests of the Class Representatives, the proposed Classes, and the University in an efficient manner.

## I.    Nature of Notice to the Proposed Classes Required

287.    In accordance with Fed. R. Civ. P. 23(c)(2), Rule 23(b)(3) class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs believe that the University maintains computer records that contain a last known address for all proposed class members. Plaintiffs contemplate that individual notice be given to class members at such last known address by first class mail, informing them of the following:

a)      The pendency of the class action, and the issues common to the class;

b)      The nature of the action;

c)      A potential class member's right to "opt out" of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

d)      A potential class member's right, if they do not "opt out," to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the Class Representatives and their counsel; and

e)      A potential class member's right, if they do not "opt out," to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

### III.     ALLEGATIONS OF NAMED PLAINTIFFS

**A.     Derick Brown**

288.    Derick Brown is a black employee of the University.

289.    Brown has been employed at the University since 2006 as a Machinist in the F&S department at UIUC.

290.    Brown's supervisor, Chris McCoy, and several of Brown's white coworkers, subjected him to a racially hostile work environment, including taunting Brown with a makeshift KKK outfit; directing racial slurs and stereotypes at him; and mocking, threatening, and intimidating him.

291.    Brown experienced racial harassment on a daily or near-daily basis.

292.    Brown reported the racist treatment to F&S management and the University's OAE department at UIUC.

293.    Despite the University's knowledge of the harassment against Brown, it took no meaningful remedial action.

294.     As a consequence, the racial harassment continued and intensified.

295.     Beginning in or around 2014, the University promoted Chris McCoy to Machine Shop Foreman. Almost immediately after McCoy's promotion, he began to use his authority to racially harass Brown and the only other black employee in the shop, Terry Cole—who upon information and belief resigned from his position in the Machine shop due to McCoy's harassment.

296.     In August 2015, Brown's coworker, Rocky Atwood, fashioned a KKK hood, put it on, and taunted Brown—while McCoy laughed along. McCoy did not report the incident to OAE as required.

297.     At least five others were present for the incident. One of them, Kendrick Pratt (deceased), took photos of Atwood wearing the KKK mask and/or just the KKK mask.

298.     Another witness, James Taylor, provided a sworn statement, at Brown's request, corroborating the incident.

299.     The University never disciplined Atwood for his actions.

300.     The University never disciplined McCoy for his failure to report the incident or for condoning it with his laughter.

301.     Following the KKK incident, the harassment against Brown grew more frequent and severe.

302.     McCoy regularly yelled and cursed at Brown in front of his coworkers, at times while using racially-derogatory language, such as referring to Brown as "boy," or with stereotypes, such as implying that Brown was lazy or stupid, and calling him "worthless".

303.     The following incidents are offered as examples of the type of racist conduct McCoy engaged in, or encouraged, often.

304.     When Brown explained that he needed assistance with an assignment, McCoy

barked at him: "After thirteen fucking years you should know how to do your job by now!"
McCoy did not belittle or yell at white workers in this manner.

305.    McCoy encouraged other white workers in the shop to similarly harass Brown,
and they did.

306.    For example, Brown's coworkers often called him "gay," "queer," and made other
comments pertaining to sexual orientation, including in the text message below:



307.    One of Brown's coworkers said that "Mississippi is the gayest state there is" and
that "most of the gays are from Mississippi." Brown is from Mississippi. McCoy egged the
worker on, adding "I heard about them boys, too." Brown's white coworkers did not call each
other gay. McCoy did not refer to whites as boys.

308.    In or around 2016, Brown told McCoy he needed to attend a funeral for a family
member. McCoy responded to the effect of: "I hope they got another coffin for you that way you
won't come back." In contrast, when Brown's white coworker had a death in the family, McCoy
gave a sympathy card signed by the entire shop.

309.    On another occasion when Brown was leaving for vacation, McCoy remarked:

"Hopefully you don't have enough gas to make it back." McCoy did not make remarks like this to white employees.

310.     McCoy regularly screamed at Brown and used profanity towards him to belittle him and ostracize him in the shop.

311.     For example, when Brown's coworker was helping him look up a part number, McCoy made a big scene about how Brown did not know how to use the reference manual, then instructed the shop that no one help Brown. All workers in the machine shop often rely on each other's expertise. White workers are not ridiculed or denied assistance in such situations.

312.     McCoy was more likely to give Brown less desirable job assignments than his white peers.

313.     For example, Brown was made to work on a ladder at heights of more than twelve feet without a safety watch. Brown was also assigned so much menial work, such as cleaning parts, that his coworkers made fun of him, saying he did not perform "real" machinist work. McCoy also made Brown perform sewage-pump work almost exclusively so his white coworkers could work in the field doing replacement work that did not require exposure to sewage.

314.     McCoy heavily scrutinized and frequently monitored Brown throughout the workday, often timing his bathroom usage then threatening to dock Brown's pay for the time he was in the bathroom. McCoy did not monitor white workers' bathroom breaks.

315.     The University was aware of the harassment against Brown because he complained repeatedly to F&S personnel and OAE. Despite Brown's complaints of discrimination, the University allowed it to continue.

316.     Brown complained to Assistant Superintendent of Operation Maintenance, Ken Bunting, in late-2016 or early-2017, specifically stating that McCoy was harassing him and treating him differently because of his race. Bunting defended McCoy, stating McCoy may have

been out of line but he did not think McCoy was racist. Bunting did not report Brown's complaint to OAE as required. Bunting held a meeting with McCoy. When he left the meeting, McCoy taunted Brown with a smirk, mocking Brown's attempt to McCoy's racist harassment. Brown is unaware of any remedial action taken in response to his complaint.

317.    In the spring of 2017, as McCoy's racial harassment worsened, Brown complained again to Bunting and Associate Director of Operations, Maintenance, and Alterations, Dave Bang. Brown complained specifically that McCoy was racially harassing him and had just yelled at him and cursed him out in front of the entire shop when he asked a coworker for assistance. He explained that white workers help each other but are never reprimanded, cursed at, or humiliated. He asked Bunting and Bang to help make McCoy stop his harassment.  Bunting and Bang held a meeting with Brown and McCoy. During the meeting Brown explained that McCoy was treating him differently because of his race, and that he deserved to be treated with respect like everyone else. Bunting and Brown said that McCoy would work on his attitude. During the meeting, Brown asked McCoy, "Is this it?" McCoy said, "Yes, I don't want to go back there.  Are we cool?" Brown said, "yes" and shook hands with McCoy. Neither Bunting nor Bang reported Brown's complaint to OAE as required, and they did not issue any discipline to McCoy.

318.    Despite McCoy's assurance to Brown, before his managers, that he would stop harassing him, he continued.

319.    In August 2017, Brown went to Bunting and Bang to complain yet again that the racism in the Machine shop was getting worse. Brown explained that McCoy was discriminating against him in assigning work orders, had reassigned him to the shop for thirty days, and had issued him a negative performance evaluation—his first in over a decade while working at the University.

320.    Bunting and Bang defended McCoy claiming they could not tell McCoy how to run his shop, and defended McCoy's treatment based on McCoy's evaluation of Brown's work. They said they would talk to McCoy again. It was clear to Brown that neither Bunting nor Brown were going to help protect him. Brown pleaded with them to understand that McCoy was racially harassing him. Brown explained that McCoy had witnessed Atwood don a makeshift KKK mask, laughed along, and failed to report the incident. Bang pressed Brown: "well, are you sure it happened?" Brown say, "yes."

321.    Bang said they were going to "process" Brown's complaint. When after a couple days Brown did not hear anything from Bunting or Bang, he called the UIUC Chancellor's office and explained to an assistant how McCoy had been racially harassing him, including that he laughed along during the KKK incident, and that he had complained to Bunting and Bang previously, but McCoy continued to racially harass him. The Chancellor's office said they would take care of it. About one day later, OAE contacted Brown and initiated its investigation in August 2017.

322.    In October 2017, consistent with its pattern or practice, the University concluded that the harassment against Brown did not constitute a violation of the University NDP. the University reached this conclusion by, *inter alia,* ignoring evidence that directly corroborated the KKK incident; ignoring evidence that McCoy referred to blacks pejoratively as "boys;" ignoring evidence that corroborated Brown's account of McCoy's abuse, including McCoy's own admissions and witness's admissions that McCoy yelled and cursed at Brown; and by failing to look at the totality of the circumstances behind McCoy's conduct in order to conclude that McCoy was not motivated by race—notwithstanding evidence of McCoy's overtly racial conduct. *See supra* Section I(A)(i) (detailing how the University expressly permits racial harassment under the NDP); Section I(A)(iii) (detailing how the University conducts biased

and/or bad faith investigations in order to avoid making harassment findings).

323.    While OAE investigated Brown's complaints, McCoy was placed on leave. The University named one of McCoy's cohorts and Brown's primary harassers, Jerry Donaldson, Interim Foreman. Donaldson immediately picked up where McCoy left off and began to racially harass Brown.

324.    Brown complained to Bunting and Bang that he did not feel safe in the shop due to all the racial animus. They told him to report back if he experienced any issues but did nothing to prevent further racial harassment.

325.    Within days of his complaint to Bunting and Bang, the windshield on Brown's car was smashed and his tires were slashed while it was parked at his home. The police told Brown that were no other similar incidents reported in his neighborhood. McCoy and several of his coworkers knew where Brown lived. Brown believed that McCoy acted in reprisal for getting him suspended.

326.    Brown reported the incident to F&S management at UIUC, who held a meeting with the Machine shop to address the treatment of Brown. The meeting was led by Assistant Superintendent of Operation Maintenance Bunting and Director of Operations, Maintenance & Alterations Pam Voitick, and included the entire Machine shop staff. The meeting quickly degraded into a referendum on Brown. Donaldson and Brown's coworker, Chad Cosack, vehemently defended McCoy and attacked Brown's character. Cosack claimed he knew things about Brown that "he shouldn't know." Donaldson protested, explaining that he felt McCoy was being treated unfairly, then requested to have a private meeting so he and others could raise complaints.

327.    All of this abuse, and Brown's first negative performance review, followed his complaints of racial harassment and prejudice.

328.    Following the meeting, most of Brown's white coworkers refused to talk with him, would not sit with him at lunch, and continued to bully him, including calling him gay and queer—insults they did not direct towards whites—at times while interim supervisor Donaldson was present, but which he did not report to OAE as required.

329.    In November 2017, the harassment against Brown culminated in his being effectively forced to seek out a tool attendant position outside of a career track just to escape the harassment, discrimination, and retaliation, of which the University was aware but refused to remedy.

330.    Even after his transfer, Brown's former white coworkers, including McCoy, continued to ignore him and refused to speak with him even when they came to the tool room. McCoy, Donaldson, and other of his former white coworkers often stared menacingly at Brown when they walked by the tool room, which is adjacent to the Machine shop.

**B.    Atiba Flemons**

331.    From 2008 to 2009 and from 2011 to present, the University has employed Atiba Flemons as a Brickmason in the F&S department at UIUC.

332.    Mr. Flemons is black.

333.    Throughout Mr. Flemons' tenure, the University has exposed him and other black employees to a racially hostile work environment, including racial slurs, stereotypes, jokes, conduct, and racist imagery, such as nooses and confederate flags.

334.    Flemons experienced some form of racial harassment on a daily or near-daily basis throughout his tenure at the University.

335.    Flemons has reported the racial harassment to University officials on multiple occasions, including to F&S management at UIUC, Human Resources at UIUC, the Chancellor's office at UIUC, and the University's OAE department at UIUC.

336.    Despites its knowledge of the racial harassment, the University took no meaningful remedial action, which led to more intense racial harassment against Flemons.

337.    Flemons' supervisor, Bruce Rodgers, racially harassed Flemons starting even before his first day of employment. On May 7, 2008, Rodgers called Flemons and left a message for him to return his call. When Flemons called Rodgers back, Rodgers said: "What was the instruction I gave you!? How can you work for me if you can't follow my instructions?"

338.    On Flemons first day of employment, Rodgers suggested that the only reason he hired Flemons was for "diversity" reasons, claiming the University "made" him hire Flemons, and that he would have rather hired the Jones brothers instead, who are white.

339.    In 2009, Flemons and a number of white employees were laid off. Rogers rehired all of the white employees within six months. After nearly two years, however, Rodgers had still not called Flemons back to work. Two of Flemons former coworkers told him that Rodgers was turning down work and hiring contractors instead of bringing Flemons back.  Flemons received a call from a coworker who told him that Rogers said he does not want Flemons back. Rodgers was actually trying to hire someone else to fill Flemons' position, but because Flemons had "call back" rights, Rodgers was unable to replace Flemons before giving him the opportunity.

340.    In 2011, when Flemons returned to work, the racial harassment resumed and intensified.

341.    Rogers regularly made racially disparaging remarks directed to or around Flemons.

342.    For example, in April 2012, Rodgers was on the phone with someone in Flemons' presence. Rodgers said to the person: "Don't worry about that. I got this big black guy in my van that will tell them not to go that way." Rodgers then began to laugh hysterically. Flemons and a white employee who was also present were shocked at the comment.

343.     On other occasions, Rogers voiced his racist disapproval of a coworker's niece who was dating an African-American man, claiming "I just don't agree with it. I think we should stick to our own kind."

344.     Some of Flemons' white coworkers have described racial jokes and comments that Rogers said, such as "I've never had a black guy tell me what to do" or telling someone "wake up to look at your black guy."

345.     On at least one another occasion, Rogers told Flemons that he would start talking like Flemons talks, then proceeded to speak in an exaggerated stereotype of black speech. This conveyed racial insult, because a reasonable interpretation of this conduct, was that Rogers believed that blacks were inferior to other races because they used slang, and intended to mock Flemons based on his race.

346.     Rodgers also mocked and degraded Flemons' work in comments to other masons, implying he was lazy and stupid. Lazy is an adjective frequently used by bigots to describe blacks.

347.     For example, typical of his treatment of Flemons, Rodgers refused to provide Flemons with a hammer that he needed for a job. Flemons was forced to go buy his own hammer. When Rodgers saw Flemons with the hammer, Rodgers claimed he had told Flemons that he would bring him a hammer, and implied that Flemons had hereditary intellectual deficits that he passed on to his son. Stupidity is another trait ascribed to blacks by racists, based on their belief that low IQ is inherited.

348.     By way of further example, when Flemons reported to Rogers that he activated a University identification card so that he could enter buildings without keys, Rogers responded, "Okay—cool, that's great." But, two days later, Rodgers confronted Flemons and yelled at him for not having keys: "Fuck You! Fuck You! You don't care. Fuck it then, Fuck it then! How are

you going to get in the Building without keys?" Several of Flemons' white coworkers witnessed the entire event. Rodgers does not curse at white employees like he does to Flemons.

349.    In April 2012, Flemons was in a Transportation van going to a coworker's retirement party. The van stopped to pick up two of Flemons' white coworkers. Rodgers pulled up alongside the van and asked what Flemons was doing. After Flemons explained, Rodgers said okay and pulled away, but suddenly turned around and said: "You know what, I want you working. Get in my van so I can take you back" and patted the passenger seat. Flemons pleaded with Rodgers: "Why are you talking to me like that. I am not a child or an animal." Rodgers yelled:  "I don't care! Get in the van so I can get you back to work. Get your Ass in the van, I gave you a direct order, get in the van now!"

350.    Flemons reported the incident to Human Resources. Flemons had a meeting with Human Resources, Bruce Rogers, and Roger's supervisor. Flemons stated specifically that he felt Rogers was harassing him and that he treated him different than his white coworkers. In accordance with its pattern or practice, the University did not investigate Flemons' complaints and did not discipline Rogers. The racial harassment continued.

351.    In May 2012, Flemons complained to the University's OAE department at UIUC about Rodger's racial harassment and discrimination.

352.    Before OAE investigated, it encouraged Flemons to participate in a mediation with Rogers. However, OAE never informed Flemons that he had a right to an investigation. During the mediation, Rogers repeated his derogatory comment about how he only hired Flemons because he was forced to for diversity reasons. OAE's Senior Associate Director was present when Rogers made the "diversity" comment during the mediation.

353.    Following the mediation, Rogers continued to racially harass Flemons. On three occasions after the mediation, Flemons informed OAE that Rogers harassment continued and

requested an update from OAE. OAE never gave Flemons a straight answer, and it was not until

a coworker informed Flemons—nearly three months after his initial complaint—that he had a

right to an investigation,

354.    In late July 2012, Flemons requested that OAE investigate his complaints.

355.    In January 2013, despite that Rogers admitted to calling Flemons a big black guy

and that he made the derogatory "diversity" comment in the presence of OAE's Associate

Director, the University concluded Rogers conduct did not violate the University NDP. *See*

*supra* Section I(A) (discussing how the University's NDP expressly permits a threshold level of

racial harassment); Section I(C)(iii) (discussing the University's policy of conducting biased

and/or bad faith investigations).

356.    Because the University condoned Rogers' harassment against Flemons, it

continued and grew more intense.

357.    Rodgers' harassment towards Flemons set an example for other white coworkers

to follow suit and similarly racially harass Flemons.

358.    One white coworker referred to black employees as "you people."

359.    Another of Flemons' white coworkers, Paul Rutledge, repeatedly harassed

Flemons for months, calling him "boot"—unsubtle shorthand for the racist term "bootlip"— and

"fucking worthless," and saying, "you must have been the fucking dumbest child when you were

growing up."

360.    Rutledge at times accompanied his racial treatment with physical intimidation,

such as following Flemons in the hallway or standing unnecessarily close to him on the stairs,

while addressing him in racially harassing terms.

361.    Flemons' make-up supervisor, Eric Quinly, and supervisor, Bruce Rodgers,

witnessed at least some of Rutledge's harassment, but did not report it or otherwise take any

steps to stop it.

362.    In June 2014, Flemons was called into OAE and informed that Rutledge had filed a grievance against him. Flemons explained to OAE that Rutledge was the one engaging in racial harassment, and that others in the Brick Mason department witnessed it.

363.    As discussed in Part I(C), supra, the University did not investigate Flemons' complaint against Rutledge.

364.    Two days later, Flemons walked out of the labor shop and heard someone behind him make a comment. When he turned around, he saw Rutledge, who followed Flemons to the top of the stairs. Standing menacingly close to, Rutledge spat: "You stupid fucking boot."

365.    Flemons immediately reported this incident to Mark Barcus, Assistant Superintendent of Building Maintenance, and advised him that Clint McGraw witnessed the entire incident.

366.    However, in July 2014, Flemons was informed that the University made a "credibility determination" and concluded that Flemons allegations against Rutledge were unfounded, but that Rutledge's allegations were credible, despite acknowledging that "no-one saw first-hand or heard the words or gestures alleged by Rutledge.

367.    Because OAE conducted a highly partial investigation, in which it ignored witnesses who would corroborate the incident, the University did not discipline Rutledge, and the racial harassment against Flemons continued.

368.    At the time of this filing, Flemons coworkers continue to use racially-derogatory stereotypes, such as calling Flemons "lazy."

369.    Rogers also excessively scrutinizes Flemons' daily movements and tells others to watch him and give him instruction, because of his biased views of the worth of black workers.

370.    For example, in January 2019, Rogers repeatedly questioned Flemons about a

recently purchased vacuum cleaner that Rogers could not find. Despite that Flemons continued to insist he had not seen the vacuum, Rogers kept pressing him, saying dismissively, "are you sure you haven't seen it."  Rogers only asked Flemons white coworkers once and took their word for it with no scrutiny. Only after a white coworker told Rogers he had not seen the vacuum since it arrived, Rogers checked his office and found the vacuum cleaner still in the box. Rogers did not apologize to Flemons for all but outright accusing him of stealing the vacuum cleaner.

371.    In addition to the pervasive racial harassment as described above, Flemons has witnessed racially offensive symbols at the University, including the confederate flag.

372.    Flemons is also aware of a class member who works in F&S who was exposed to a noose in April 2016, when a white work in the Grounds department tied a noose (pictured above at para. 45) then taunted a black employee with it.

373.    Following this incident, one of Flemons' white coworkers told him that the noose was not a big deal because it was "just a small noose."

374.    In March 2017, Flemons observed a confederate flag on a truck parked at the University inventory store.

375.    The truck was parked in the employee lot, which requires an employee pass to enter the lot.

376.    Again, in June 2017, Flemons witnessed a car with two confederate flag stickers in its windows, one of which read, "Kiss My Flag," accompanied by University of Illinois stickers (picture *supra* at para. no. 167).

377.    The vehicle was regularly parked directly outside the University Press building where only employees park.

378.    On June 26, 2017, Flemons submitted a written complaint regarding the flag to the Director of UIUC OAE, Heidi Johnson, providing images of the vehicle.

379.    Johnson acknowledged receipt of Flemons' complaint; however, despite that Flemons identified himself as a University employee and followed University policy by bringing his complaint to OAE, Johnson told Flemons that a student-focused group would be in contact with him to investigate. No student group ever contacted Flemons.

380.    Flemons complaint has never been investigated.

**C.    Jeffrey Taylor**

381.    Jeffrey Taylor has been employed at the University since 2015 as a Culinary Worker III in the Dining department.

382.    Taylor is black.

383.    Beginning in or around 2016 and continuing presently, several of Taylor's supervisors and coworkers subjected him to a racially hostile work environment, including racial slurs, comments, and race-based conduct.

384.    Taylor experienced racial harassment on a daily or near-daily basis.

385.    Taylor reported the racist treatment he experienced to his supervisors, Human Resources, and the University's OAE department at UIUC.

386.    Despite its knowledge of the harassment against Taylor, the University took no meaningful remedial action.

387.    As a consequence, the racial harassment continued and intensified.

388.    Taylor and other black employees have been repeatedly exposed to racial slurs, such as the N word.

389.    For example, in or around October 2017, a white Dining supervisor, Kalan Janowski, wrote on Facebook, "I eat n****s like you" and made a derogatory comment about black women wearing "weaves" to Taylor's acquaintance who is black. Janowski identified himself as a University supervisor on his Facebook page.

390.    Taylor reported Janowski's use of the N word to Human Resources and OAE; however, in accordance with its pattern or practice of ignoring complaints of racial harassment, the University refused to take any action. Instead, Rita Davis from Human Resources was dismissive of Taylor's opposition and explained the University would not discipline Janowski because it was an off-campus incident based on hearsay—despite that Taylor showed Davis screenshots of the reaction to Janowski's message. Davis then suggested Janowski's use of the N-word was acceptable because he had a mixed-race relative.

391.    On another occasion, in March 2018, Taylor's coworker sent him a message regarding a workplace disagreement. The coworker called Taylor a "bitch" and used the N word in a message (pictured *supra* at para. no. 220).

392.    Taylor reported the worker and gave a copy of the text message to Rita Davis. However, the University again ignored Taylor's complaint and failed to discipline the offender. Davis marginalized Taylor's report, and callously and needlessly read the message aloud, including the slurs, during a meeting with Taylor and his supervisors. Davis then suggested that it was acceptable for Taylor's coworker to use the N word because she, too, is black. Human Resources informed Taylor that his coworker would not be disciplined for using the N word.

393.    Because the University does not discipline employees who use the N word, other employees understand that racial slurs are acceptable.

394.    In December 2018, Terry Tester, a white Culinary Worker who on Taylor's shift directed the N word to a black employee, stating that his child's favorite word is "n*gga."

395.    The employee told Taylor what happened and reported Tester to Executive Chef Carrie Anderson. Tester admitted to Anderson that he used the N word and repeated it several times during his conversation with Anderson, arguing that "once people of color give you the okay, you can say n*gga," and that using the word with the employee was his way of "testing the

66

waters" with her.

396.    Anderson reported Tester to her supervisor, Chris Henning. However, the University refused to terminate Tester, despite that he was already on probation. Instead, the University claimed that it was an "opportunity to educate people" and issued Tester a "letter of concern," which is not disciplinary.

397.    In addition to the N word, Taylor is aware of black colleagues who have been called "monkey," a noose that was found in a campus bathroom by a BSW worker, and racist graffiti, including the swastika that Taylor's colleague found in Dining in late 2016 (pictured above at para. 45).

398.    In addition to racial slurs and symbols, Taylor and other black employees are racially harassed by white supervisors.

399.    Taylor's former supervisor, Don Van Liew, regularly badgered Taylor, excessively monitored and scrutinized his work and daily movements, policed his tone, used profanity towards him, and treated him as inferior to his white coworkers.

400.    For example, in Fall 2017, Van Liew reported Taylor for not being in uniform despite that Taylor was wearing University-approved attire and that he explained to Van Liew that he did not have any clean uniforms, which the University is responsible for supplying. On the same day, Van Liew also reported another black employee for not wearing a uniform but did not report two white workers who were wearing the same attire as Taylor and the other black employee.

401.    Taylor complained to Unit Manager Keith Garrett that Van Liew was targeting black employees for conduct that white workers were not being harassed over. Garrett took no action to stop Van Liew's harassment even though he acknowledged that Taylor was wearing permitted attire.

402.    By way of further example, in Fall 2017, Van Liew would not permit Taylor to use a pushcart to carry his supplies to his workstation and made him carry the supplies by hand. Van Liew aggressively snatched a cart from Taylor's hands then allowed Taylor's white coworkers to use push carts to carry their supplies. Push carts are not assigned to any specific employee but are utilized on a first-come first-served basis.

403.    Van Liew regularly verbally berated Taylor in front of coworkers, often yelling or using profanity—only to then police Taylor's tone in response.  For example, on one occasion, Taylor requested Van Liew's assistance to correct a student worker's computer mistake. Van Liew yelled: "What do you need help with!" Taylor explained. Van Liew proceeded to scrutinize Taylor's decision to take pre-orders from customers while the computer was down. Van Liew reported Taylor for apparently raising his voice during the exchange, but it was Van Liew who was loud and rude.  Taylor is also aware of other black employees whom Van Liew has written up for allegedly raising their voice. Van Liew does not treat white workers this way.

404.    On another occasion, in 2017, Executive Chef Carrie Anderson held a brief meeting with Taylor and Van Liew to discuss Taylor's assignment. Moments later, Van Liew angrily questioned Taylor why he was doing the assignment. Taylor explained. Van Liew then wrote Taylor up for allegedly using profanity. Taylor protested the write-up to Unit Manager Keith Garrett and explained several of his coworkers who were present would confirm that he did not use profanity. Garret did not ask any of Taylor's coworkers whether he used profanity and disciplined Taylor based on Van Liew's false accusation. Several of Taylor's white coworkers regularly use profanity in the workplace but are not written up or otherwise disciplined.

405.    Van Liew is often jovial and socializes with white workers but makes black workers stay busy at all times.

406.    On one occasion, in Fall 2017, Van Liew was sitting at a station with several white employees, laughing and joking. He suddenly got up, walked to the adjacent station where a black employee was working, and made the employee perform an unrelated task just to keep her busy. He then went back and continued his conversation with the white employees.

407.    Van Liew regularly surveilled and excessively monitored Taylor, often staring at Taylor while he worked and even while he was on break. Van Liew would badger Taylor about what was on his to do list or why he was or was not performing certain tasks. Van Liew would question Taylor why he was wrapping his food, insinuating that Taylor was trying to steal food. However, most employees wrap their food to keep it warm. Van Liew did not monitor white employees like he did Taylor.

408.    Other Dining supervisors also racially harassed Taylor and other black employees. For example, Taylor witnessed his supervisor, Dale Martin, yell at and aggressively snatch a black student's meal card from his hand and accuse him of trying to steal food because the meal card was not working. Martin then falsely claimed the student hit him. Student meal cards frequently malfunction. In such situations, Taylor has witnessed Martin give white students the food they are trying to purchase and record their student number to enter it manually later.

409.    Less than a week after this incident a group of six white students moved a gate to enter the dining hall after it was closed, and without attempting to use their meal cards, they began eating food and getting drinks. Martin acknowledged what was taking place but did not try to approach the students, and simply said, "oh well."

410.    Taylor complained of the difference in treatment between the black student and the white students during a group meeting with Housing Director Alma Sealine, but she merely brushed the incident aside. She took no corrective action against Martin and instead parroted Martin's false claims about the black student trying to steal food.

411.    Another supervisor reported Taylor for simply telling him that he was not speaking to the supervisor when the supervisor interrupted Taylor's conversation with another employee. About one week later, the same supervisor nearly struck Taylor with an oven door when he aggressively opened it as Taylor was walking by.

412.    Taylor complained on several occasions to the University about the racial harassment that he experienced. Pursuant to its pattern or practice, the University ignored his complaints, failed to initiate bona fide investigations, and permitted Van Liew's and others' harassment of Taylor by concluding the harassment did not violate the University's Nondiscrimination Policy.

413.    As a result of the harassment that Taylor experienced, he was forced to change his schedule significantly to ensure he did not work among supervisors who used racial slurs or who harassed him, including Janowski and Van Liew. As a consequence, Taylor no longer works in the advanced cook-to-order Chophouse station or on other shifts where there were significant overtime opportunities. Taylor's compensation and career trajectory materially suffered as a consequence of the racial harassment to which the University subjected him.

414.    In addition to his complaints to Human Resources (N word) and Garrett (harassment and disparate treatment), Taylor also complained to the University's OAE department at UIUC in October 2017 about the racial harassment that he experienced. While the investigation remained open, Taylor provided updates to OAE of additional examples of racial harassment that he experienced during the eight months before OAE issued its report, including the use of the N word by his coworkers.

415.    OAE issued its report in July 2018, and pursuant to its written policy, which allows a base level of harassment, the University concluded that Taylor did not experience a violation of the University NDP.

416.    To reach this conclusion, the University failed to look at the totality of circumstances, instead taking the narrowest view possible of Taylor's complaints. The report only addressed Taylor's complaints with respect to Van Liew. It neither mentioned Taylor's complaints about University employees using the N word in October 2017 and March 2018, nor his complaints about an overall racial climate in Dining. The University also ignored corroborating evidence provided by several of Taylor's witnesses, and looked at each of Van Liew's actions in isolation.

417.    Because the University concluded that Taylor did not experience a violation of the NDP, neither Van Liew or any other employees received discipline.

418.    As a consequence, Taylor and other black employees continue to experience racial harassment, including by workers who have since use of the N word.

## IV.    INDIVIDUAL CLAIMS OF NAMED PLAINTIFFS NOT ENCOMPASSED BY THE CLASS CLAIMS

### A.    Derick Brown

i.    <u>Retaliation</u>

419.    As more fully set forth in Section III(A), supra, the University subjected Mr. Brown to years of racial harassment. Brown's white coworkers and supervisors exposed him to racially-violent symbols, including a mock-KKK mask; used racial stereotypes, such as making comments to imply Brown was lazy and stupid; used racial language, such as "boy;" yelled, cursed at, and belittled Brown because of his race; ignored and ostracized him; excessively scrutinized his daily movements, including timing his bathroom usage; and made him perform the worst assignments, such as cleaning sewage pumps while white workers performed field work that did not require exposure to sewage.

420.    Brown complained to F&S management and OAE about the racial harassment that he experienced from his supervisor and coworkers. As a result, he was subjected to

retaliation, including adverse actions designed to punish, intimidate, and discourage Brown and others from reporting harassment, such as increasingly hostile harassment, increased scrutiny, negative employment evaluations, job reassignment, vandalism of property, threats and intimidation, and ultimately forcing Brown to seek a transfer out of his trade in the Machine shop.

421.    Brown complained to Assistant Superintendent of Operation Maintenance Ken Bunting in late-2016 or early-2017. Brown told Bunting that McCoy was racially harassing him. Bunting held a meeting with McCoy to discuss Brown's complaint. Following the meeting, McCoy taunted Brown.

422.    Following Brown's complaint, McCoy intensified his harassment. McCoy heavily scrutinized Brown's work and made it a point to expose any perceived shortcomings or weaknesses in Brown's knowledge to the entire shop to embarrass and ostracize him.

423.    Brown complained again to Bunting, and also to the Associate Director of Operations, Maintenance, and Alterations, Dave Bang, in spring 2017. Brown explained that McCoy's racial harassment had become worse. Bunting and Bang held a meeting with Brown and McCoy. During the meeting, Brown explained that he felt that McCoy treated him differently than white workers, including that McCoy frequently yelled and cursed at him but that McCoy did not do that to Brown's white coworkers.

424.    During the meeting, McCoy apologized to Brown, but he nonetheless amplified his harassment following the meeting.

425.    Upon information and belief, McCoy told Brown's coworkers that Brown had reported him for racial harassment. His coworkers stopped talking to him, alienated him in the shop, and lobbied McCoy to give Brown worse assignments. McCoy reassigned Brown to the shop for thirty days, disallowing him to participate in assignment rotation like his white

coworkers who did not complain of racial harassment. While Brown's white coworkers worked outside of the shop, Brown was assigned the most menial and disgusting shop work that no one wanted to perform, such as cleaning parts or working on sewage pumps. His coworkers began to mock him for not being a real machinist.

426.    In August 2017, Brown complained again to Bunting and Bang that McCoy's treatment of him was getting worse. Brown explained that McCoy was discriminating against him in assigning work orders, reassigned him to the shop for thirty days, and issued him a negative performance evaluation—his first in over a decade of employment at the University. Brown also explained that McCoy had witnessed Rocky Atwood don a makeshift KKK hood, laughed along while Atwood taunted Brown, and failed to report the incident.

427.    McCoy was placed on temporary leave while OAE investigated Brown's complaints. Brown's coworkers ensured that Brown paid a price for complaining of discrimination. Brown reported to Bunting and Bang that he did not feel safe in the shop, considering Jerry Donaldson—McCoy's cohort who also harassed Brown—was named the interim supervisor. Bunting and Bang told Brown to report back if he experienced any issues but did nothing to protect Brown.

428.    Within days, Brown's car was vandalized at his home. His tires were slashed and his windshield was cracked. McCoy and several of his coworkers knew where he lived. The police told Brown that no one else in his neighborhood reported similar vandalism.

429.    Brown believes the vandalism was intended as a violent warning to back off his complaints of racial harassment and punishment for complaining.

430.    Brown reported what happened to F&S management who held a meeting with the entire Machine shop to address retaliation against Brown. However, Donaldson and Brown's coworker, Chad Cosack, hijacked the meeting to defend McCoy and attack Brown. Cosack

claimed knew things about Brown that "he shouldn't know."  Donaldson said that McCoy was

being treated unfairly and demanded a private meeting so he and others could raise complaints

against Brown.

431.    Thereafter, most of his coworkers would not speak to him or sit with him at lunch.

When the University concluded that McCoy's behavior did not constitute a violation of the

University NDP, the University allowed McCoy to return to the Machine shop.

432.    Because the University refused to protect Brown from McCoy and other's racial

harassment and retaliation for his opposition, Brown had no choice but to protect himself and

requested a transfer to a tool attendant position in spite of the fact that he is a skilled machinist.

433.    Even his transfer has not stopped McCoy, Donaldson, and others from mistreating

Brown in retaliation for his opposition. McCoy and Donaldson frequently stared at Brown

menacingly when they passed the tool room where Brown now works.

434.    In November 2018, a white worker, Ron Clair, came to the toolroom and

attempted to intimidate Brown for his opposition to McCoy's racial harassment, exclaiming to

Brown that what he did to McCoy was "just wrong."

435.    In December 2018, Brown locked the Toolroom and was preparing to go to lunch.

All of a sudden, Clair entered the Toolroom through a locked door connecting the Toolroom to

the Machine Shop. Clair looked at Brown, grabbed a tool, and exclaimed loudly as he walked

out: "You closed the tool room pretty early, huh!?"

436.    Employees are not permitted to have unsupervised access to the Toolroom. Brown

learned that one of his former harassers, Chad Cosack, provided the key to Clair to enter the Tool

Room.

437.    Brown reported to F&S Management that he feared for his safety because Clair

made previous comments about Brown's opposition to racial harassment and should not have

entered the Toolroom when it was locked.

438.    But for Brown's opposition to racial harassment and discrimination, he would not have been physically threatened and subjected to the several adverse actions described above.

439.    The University's conduct following Brown's complaints about racial harassment has a chilling effect that would dissuade other employees. from reporting harassment and discrimination.

**B.    Atiba Flemons**

i.    <u>Disparate Treatment</u>

440.    Because Mr. Flemons is black, the University discriminated against him with respect to promotion opportunities, discipline, and compensation.

441.    In October 2015, Mr. Flemons attempted to update his University application so he could take the Foreman's Civil Service exam. However, University Human Resources disallowed Flemons from updating his application, claiming that he was not qualified to become a Foreman or Sub Foreman because he did not have enough experience.

442.    Mr. Flemons had two more years of relevant experience than his present Sub Foreman, Eric Quinly, who is white, and who took the test shortly before Flemons attempted to.

443.    Sub Foremen make an extra $1.50 per hour when they are performing the role.

444.    Flemons has also been repeatedly denied overtime opportunities when white workers were offered overtime.

445.    Flemons' Foreman, Bruce Rogers, has discretion with respect to whom, how, or whether to distribute overtime.

446.    By way of example only, on some occasions, Rogers would offer overtime to white workers Eric Quinly or Bill Mastey, but they would decline. Rogers would work the overtime himself instead of giving Flemons the opportunity.

447.    On another occasion, Rogers called four white workers offering overtime, but

never asked Flemons. Rogers then stated that he could not find anyone to work the overtime, even though Flemons was already assigned to the project in which overtime was required. The Building Inspector witnessed Rodgers' discrimination in assigning the overtime and rescinded the overtime request.

448.    Rogers will sometimes hire contractors instead of offering overtime to Flemons or make overtime requests on days in which he knows Flemons cannot work overtime.

449.    By way of example only, in December 2016, Rogers asked if Flemons would work overtime immediately following Christmas. Given the shop was closed during the holidays, both Flemons and his coworker Eric Quinly refused.

450.    Instead of rescheduling the overtime to a time when Flemons could work, Rogers worked the overtime himself.

ii.    <u>Retaliation</u>

451.    As set forth more fully in Section III(b) supra, the University subjected Mr. Flemons to years of racial harassment and discrimination. Among other racial harassment, Flemons' white supervisor and coworkers used racially derogatory language such as referring to Flemons as a "big black guy;" used racial stereotypes, for example, calling Flemons lazy or implying that he had a hereditary lack of intelligence; yelling and cursing at him; issuing unwarranted discipline; and excessively scrutinizing and monitoring Flemons throughout the day.

452.    Flemons repeatedly opposed Rodgers' and others' racial harassment on numerous occasions.

453.    As a result of Flemons' opposition, Rodgers retaliated against Flemons by subjecting him to increasingly hostile harassment and discrimination, providing negative performance evaluations, and issuing him unwarranted discipline in an effort to punish,

intimidate, and discourage Flemons and others from reporting harassment

454.    By way of example only, following Flemons' complaints in 2012 regarding Foreman Rogers harassment and discrimination, Rogers has consistently evaluated Flemons poorly. Prior to his complaints of harassment, Rogers did not negatively evaluate Flemons.

455.    Upon information and belief, Rogers evaluates Flemons' white coworkers positively.

456.    Rogers also wrote up Flemons or threatened discipline for behavior for which white employees were not written up.

457.    Rogers has denied Flemons overtime opportunities due to Flemons opposition to his harassment and discrimination.

458.    Rogers' increased racial harassment, threats, discipline, negative evaluations, and denial of overtime against Flemons is designed to punish him for his complaints of racial harassment and silence him and other black employee from making complaints in the future.

459.    But for Flemons opposition to Rodgers' and others' racial harassment, he would not have been exposed to the material adverse actions described above.

460.    The University's actions against Flemons has a chilling effect that would dissuade a reasonable employee from reporting harassment and discrimination.

**B.    Jeffrey Taylor**

i.    Disparate Treatment

461.    The University subjected Mr. Taylor to discrimination with respect to promotion opportunities and discipline.

462.    In early 2016, the University advertised two head cook positions, which paid $19-21 per hour and required two years of prior experience in quantity cooking. Taylor was qualified for the positions. Based on Taylor's skills and qualifications, his head chef encouraged him to apply.

463.    Taylor applied online. However, University Human Resources sent Taylor a letter, which explained that he could not sit for the Civil Service test because he did not have enough prior experience. Taylor has worked in restaurants since 2006, which includes several years of experience in high-quantity kitchens, including kitchens where production was comparable or greater to UIUC's largest dining facility, Ikenberry, where Taylor worked.

464.    In or around summer 2016, Taylor learned that two white employees were promoted to the head cook position, including Carl Joyce who had less experience than Taylor, and who started at the University after Taylor.

465.    Because Mr. Taylor is black, the University denied him a promotional opportunity to a position for which he was qualified and to which the University promoted a lesser qualified white applicant.

466.    Taylor and other black employees are also disciplined more severely than white workers for the same conduct and/or issued discipline for alleged conduct in which white workers engage but for which they are not disciplined, relating to University's uniform policy, use of profanity, and/or verbal tone.

467.    By way of example only, in October 2017, Don Van Liew reported Taylor and another black employee for wearing black pants and University polo shirts instead of the typical uniform consisting of a white jacket.

468.    Van Liew did not report two white employees who were dressed like Taylor.

469.    Unit Manager Garrett admitted to OAE that "it is acceptable for cooks to wear black slacks, a University issued polo shirt, and slip-resistant shoes when they are out of clean uniforms. Otherwise, all cooks are expected to be in uniform."

470.    Van Liew himself admitted to OAE that he is twice as likely to report black employees for not wearing white jackets as he is white employees when he provided a list of

employees with whom he has had corrective contact regarding uniforms. Including Taylor, the list was comprised of six black employees and just three white employees, despite that in 2017 when this incident occurred, white food service employees outnumbered black employees.

471.    Taylor has also received discipline for his "tone" or for allegedly using profanity.

472.    White workers, in contrast, do not have their tone policed and are not written up like Taylor and other black employees.

473.    Several of Taylor's white coworkers, such as Heather Fairbanks, regularly use profanity out loud in the workplace or talk back to supervisors but are not disciplined.

ii.    <u>Retaliation</u>

474.    As set forth more fully in Section III(c), supra, the University subjected Taylor to years of racial harassment. Among other racial harassment, several of Taylor's coworkers have openly used the N word around and to Taylor; have referred to black employees as "monkey" and made racial graffiti, including swastikas in Taylor's department; his supervisors police his tone; yell and curse at him; and regularly badger and scrutinize black employees while allowing white employees to perform their jobs without any interruption.

475.    Taylor has reported the racial harassment and discrimination that he experienced to his supervisors, the Director of Housing, Human Resources, and the University's OAE department at UIUC.

476.    Because of Taylor's protected activity, the University has subjected Taylor to adverse actions designed to punish, intimidate, and discourage Taylor and other black employees from reporting racial harassment, including additional and more intense harassment and discipline for infractions he did not commit or for which workers who do not complain of harassment and discrimination were not disciplined.

477.    For example, in or around October 2017, Taylor reported to Dining management

and Human Resources that a University Dining supervisor, Kalan Janowski, used the N word and

other racially derogatory language towards Taylor's black acquaintance. Taylor had a meeting

with Rita Davis from Housing Human Resources and Dining Associate Director Chris Henning,

during which the University informed Taylor it would not discipline Janowski. Taylor left the

meeting with the impression that he himself was in trouble for reporting the incident because

Davis and Henning were dismissive of Taylor's concerns and intimidating in the tone and nature

of the way they "interrogated" him about his knowledge of the incident.

478.    Within weeks of his complaint, Taylor's supervisors increased their harassment,

which included Van Liew aggressively approaching Taylor, yelling at him, then reporting Taylor

to Unit Manager Keith Garrett for being out of uniform, even though he was wearing University-

approved attire.  Taylor complained to Garrett that Van Liew was racially harassing him.

Following Taylor's complaint to Garrett, Van Liew approached Taylor and claimed that Taylor

had "lied" to Garrett about whether he was in uniform or not.

479.    Over the weeks and months following Taylor's complaints, including his

complaint to Garrett, Van Liew continued to racially harass him, including constantly monitoring

him, watching him, and loudly questioning and scrutinizing Taylor throughout the day.

480.    As a result of Van Liew's retaliatory racial harassment, Taylor was constructively

reassigned, when had no choice but to request that his assignments and shifts be changed to

protect himself from Van Liew, resulting in economic hardship to Taylor since he was no longer

able to work assignments and shifts that provided lucrative overtime opportunities.

481.    In late-October 2017, Housing Director Alma Sealine held a meeting with the

staff in the Ikenberry dining facility. Taylor voiced his concern about recent racial incidents in

Dining, including that black diners were being harassed and treated differently than white diners.

Taylor explained a white supervisor, Dale Martin, recently denied a black student service and

accused him of trying to steal food when the student's meal card malfunctioned, but that in contrast, white supervisors worked with white students in similar situations to make sure they got their meals and did not accuse them of stealing.

482.    Sealine brushed off Taylor's complaints during the meeting and claimed that Martin's actions were appropriate because the black student was trying to steal.

483.    Taylor filed a complaint with OAE in October 2017 about his supervisors' and coworkers' racial harassment and discrimination against him. Taylor updated his complaint throughout much of 2018.

484.    As a result of his complaints, Taylor's supervisors intensified their racial harassment, including by closely monitoring all of his daily movement and work. For example, Taylor's supervisors would regularly question the work that he was doing and why, and when he explained they would double check his explanation, police his tone and report him for raising his voice. Taylor has received written discipline and probation for "tone" infractions following his complaints of discrimination.

485.    White workers and workers who did not complain of discrimination were not treated this way.

486.    But for Taylor's opposition to racial harassment, he would not have been subjected to the adverse actions described above.

487.    The University's actions against Taylor for his complaints of harassment and discrimination have a chilling effect that would dissuade a reasonable employee from reporting harassment and discrimination.

## V.  CLAIMS FOR RELIEF

### First Claim for Relief

Hostile Work Environment in Violation of Title VII
(*On Behalf of Named Plaintiffs and the Proposed Classes*)

488.  Plaintiffs incorporate by reference each of the foregoing paragraphs.

489.  The foregoing conduct violates Title VII of the Civil Rights Act of 1964.

490.  The University has engaged in illegal, intentional discrimination on the basis of race by maintaining policies, practices, and/or procedures that create, tolerate, and perpetuate a hostile work environment based on race against the Plaintiffs and members of the proposed Classes.

491.  Plaintiffs and members of the proposed Classes have repeatedly and explicitly complained to the University about racial harassment.

492.  Despite the University's notice of the harassment and discrimination perpetrated against black employees, it has failed to take adequate remedial measures.

493.  As a consequence of Defendant's policies, practices, and/or procedures, the Plaintiffs have suffered severe emotional distress.

494.  Defendant's actions proximately caused the Named Plaintiffs' and Class members' injuries.

495.  Plaintiffs request relief as provided in the Prayer for Relief below.

### Second Claim for Relief

Hostile Work Environment in Violation of the Illinois Civil Rights Act
(*On Behalf of Named Plaintiffs and the Proposed Classes*)

496.  Plaintiffs incorporate by reference each of the foregoing paragraphs.

497.  The foregoing conduct violates the Illinois Civil Rights Act.

498.  The University has engaged in illegal, intentional discrimination on the basis of race by maintaining policies, practices, and/or procedures that create, tolerate, and perpetuate a

hostile work environment based on race against the Plaintiffs and members of the proposed

Classes.

499.     Plaintiffs and members of the proposed Classes have repeatedly and explicitly

complained to the University about racial harassment.

500.     Despite the University's notice of the harassment and discrimination perpetrated

against black employees, it has failed to take adequate remedial measures.

501.     As a consequence of Defendant's policies, practices, and/or procedures, the

Plaintiffs have suffered severe emotional distress.

502.     Defendant's actions proximately caused the Named Plaintiffs' and Class

members' injuries.

503.     Plaintiffs request relief as provided in the Prayer for Relief below.

### Third Claim for Relief

Retaliation in Violation of Title VII
(*On Behalf of Named Plaintiffs Individually for their Non-Class Claims*)

504.     Plaintiffs incorporate by reference each of the foregoing paragraphs.

505.     Plaintiffs engaged in protected activity by complaining about racial

discrimination.

506.     The University engaged in illegal retaliation by, *inter alia*, intensifying the

racially hostile work environment against Plaintiffs, threats and intimidation against Plaintiffs,

issuing negative performance evaluations, forcing Brown and Taylor to seek a transfer to

different department and/or shifts, denying overtime and promotional opportunities to Flemons

and Taylor, and issuing discipline to Flemons and Taylor.

507.     Defendant's retaliatory conduct in response to Plaintiffs' protected activity has a

chilling effect that acts as a deterrent to other employees from making complaints of

discrimination.

508.     As a consequence of the University's conduct, Plaintiffs suffered severe emotional distress and economic loss.

509.     Defendant's actions proximately caused Plaintiff's injuries.

### Fourth Claim for Relief

<u>Retaliation in Violation of the Illinois Civil Rights Act</u>
(*On Behalf of the Named Plaintiffs Individually*
*for their Non-Class Claims*)

510.     Plaintiffs incorporate by reference each of the foregoing paragraphs.

511.     Plaintiffs engaged in protected activity by complaining about racial discrimination.

512.     The University engaged in illegal retaliation by, *inter alia*, intensifying the racially hostile work environment against Plaintiffs, threats and intimidation against Plaintiffs, issuing negative performance evaluations, forcing Brown and Taylor to seek a transfer to different department and/or shifts, denying overtime and promotional opportunities to Flemons and Taylor, and issuing discipline to Flemons and Taylor.

513.     Defendant's retaliatory conduct in response to Plaintiffs' protected activity has a chilling effect that acts as a deterrent to other employees from making complaints of discrimination.

514.     As a consequence of the University's conduct, Plaintiffs suffered severe emotional distress and economic loss.

515.     The University's actions proximately caused Plaintiff's injuries.

### Fifth Claim for Relief

<u>Disparate Treatment in Violation of Title VII</u>
(*On Behalf of Plaintiffs Flemons and Taylor*
*Individually for their Non-Class Claims*)

516.     Plaintiff Flemons and Taylor incorporate by reference each of the foregoing paragraphs.

517. The University discriminated against Plaintiffs Flemons and Taylor by, *inter alia,* treating them differently and worse than similarly-situated white employees in promotion, discipline, and overtime opportunities.

518. As a consequence of the University's conduct, Plaintiffs suffered economic injury and emotional distress.

519. Defendant's actions proximately caused Plaintiffs' injuries.

### Sixth Claim for Relief

<u>Disparate Treatment in Violation of the Illinois Civil Rights Act</u>
(*On Behalf of the Plaintiffs Flemons and Taylor*
*Individually for their Non-Class Claims*)

520. Plaintiffs Flemons and Taylor incorporate by reference each of the foregoing paragraphs.

521. The University discriminated against Plaintiffs Flemons and Taylor by, *inter alia,* treating them differently and worse than similarly-situated Caucasian employees in promotion, discipline, and overtime opportunities.

522. As a consequence of the University's conduct, Plaintiffs Flemons and Taylor suffered economic injury and emotional distress.

523. Defendant's actions proximately caused Plaintiff's injuries.

### V. RELIEF ALLEGATIONS

524. Plaintiffs and the Classes they represent have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief sought in this action is the only means of securing complete and adequate relief. Plaintiffs and the Classes they represent are now suffering and will continue to suffer irreparable injury from the University's discriminatory acts and omissions.

## VI.  DEMAND FOR JURY TRIAL

525.  Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

## VII.  PRAYER FOR RELIEF

526.  WHEREFORE, Plaintiffs and the proposed Classes pray for relief as follows:

527.  Certification of the Classes under Rules 23(b)(2), 23(b)(3) and 23(c)(4), and designation of the Plaintiffs Derick Brown, Atiba Flemons, and Jeffrey Taylor as representatives of the Classes, and their counsel of record as Class Counsel;

528.  Compensatory and lost compensation damages for all class members arising from the racially hostile work environment;

529.  Lost compensation, due to disparate treatment, termination, retaliation and constructive termination, and compensatory damages, if warranted, for each Plaintiff, for claims they assert, if any, different than class claims;

530.  Punitive damages;

531.  A preliminary and permanent injunction against Defendant and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from maintaining a hostile work environment on the basis of race. Such relief at minimum should include implementation of effective policies to prevent and correct racial harassment, including amending the University's definition of harassment, institution of mandatory training to University investigators as to findings and conclusions of impermissible conduct under the University's NDP's, effective avenues for reporting harassment and measures to prevent retaliation; implementation of mandatory training regarding harassment for all of Defendant's managerial and non-managerial employees; and implementation of effective discipline for harassment; Plaintiffs reserve the right to expand the scope of injunctive relief sought, as necessary, as discovery progresses;

532.     A declaratory judgment that the practices complained of in this Amended

Complaint violate Title VII and ICRA;

533.     Costs incurred, including reasonable attorneys' fees, to the extent allowable by

law;

534.     Pre-Judgment and Post-Judgment interest, as provided by law; and

535.     Such other and further legal and equitable relief as this Court deems necessary,

just and proper.

Dated: February 19, 2019
            Mamaroneck, New York

                                        Respectfully Submitted,

                                        By: /s/ Rebecca Houlding
                                        Rebecca Houlding
                                        Jesse Centrella
                                        **FRIEDMAN & HOULDING LLP**
                                        1050 Seven Oaks Lane
                                        Mamaroneck, NY 10543
                                        888.369.1119 x 5
                                        866.731.5553
                                        rebecca@friedmanhoudingllp.com

                                        *Counsel for Plaintiffs*