E-FILED
Monday, 03 April, 2023  08:32:13 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS

DERICK BROWN, ATIBA FLEMONS, and
JEFFREY TAYLOR,

               Plaintiffs,

    v.

THE BOARD OF TRUSTEES OF THE
UNIVERSITY OF ILLINOIS,

               Defendant.

Case No. 2:19-cv-02020-JBM-EIL

Honorable Joe Billy McDade

Magistrate Judge Eric I. Long

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF
## DERICK BROWN'S CLAIMS

Dated: April 3, 2023

Respectfully Submitted,

**DEFENDANT THE UNIVERSITY OF
ILLINOIS**

By:  *s/ Christopher B. Wilson*
     One of Its Attorneys

     Christopher B. Wilson
     Jonathan R. Buck
     **PERKINS COIE LLP**
     110 North Wacker, Suite 3400
     Chicago, IL 60606-1511
     Tel: (312) 324-8400
     Fax: (312) 324-9400
     cwilson@perkinscoie.com
     jbuck@perkinscoie.com

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND.................................................................................. 1

     A.     Brown's employment with the University. ........................................... 1

     B.     The University promptly remediates Brown's interpersonal conflicts with McCoy.................................................................................................... 2

     C.     Brown complains of discrimination for the first time in July 2017 and the University initiates and completes a prompt, thorough investigation................ 3

     D.     Brown was not subjected to any form of retaliation. .......................... 5

III.    ARGUMENT ......................................................................................................... 6

     A.     Standard of Review................................................................................ 6

     B.     Plaintiff's Hostile Work Environment Claim Fails. ............................. 7

          1.     The foundational incident underlying Plaintiff's hostile work environment claim is time-barred. .......................................... 7

          2.     Brown was not subjected to a hostile work environment. ..................... 8

          3.     There is no basis to hold the University liable for a hostile work environment. .................................................................... 10

     C.     Brown's Retaliation Under Title VII Fails as a Matter of Law. ...................... 12

          1.     Brown was not subject to a material, adverse employment action. ....... 13

          2.     Brown's performance write-up was not due to his protected activity.................................................................................... 14

IV.    CONCLUSION..................................................................................................... 15

CERTIFICATE OF SERVICE ..................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Abrego v. Wilkie*,
  907 F.3d 1004 (7th Cir. 2018) ........................................................................9, 15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...............................................................................................7

*Arnold v. Visiontek Prod.*, LLC,
  748 F. App'x 59 (7th Cir. 2019) .........................................................................14

*Atanus v. Perry*,
  520 F.3d 662 (7th Cir. 2008) ................................................................................9

*Bless v. Cook Cnty. Sheriff's Off.*,
  9 F. 4th 565 (7th Cir. 2021) ................................................................................12

*Boss v. Castro*,
  816 F.3d 910 (7th Cir. 2016) ................................................................................7

*Brown v. Advoc. S. Suburban Hosp.*,
  700 F.3d 1101 (7th Cir. 2012) ............................................................................13

*Burks v. Wis. Dept. of Transp.*,
  464 F.3d 744 (7th Cir. 2006) ..............................................................................15

*Burlington Indus., Inc. v. Ellerth*,
  524 U.S. 742 (1998) .............................................................................................10

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ...............................................................................................13

*Carter v. Pension Plan Of A. Finkl & Sons Co. For Eligible Off. Ems.*,
  654 F.3d 719 (7th Cir. 2011) ................................................................................6

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...............................................................................................6

*Collins v. Meike*,
  52 F. App'x 835 (7th Cir. 2002) .........................................................................13

*Cung Hnin v. TOA (USA), LLC*,
  751 F.3d 499 (7th Cir. 2014) ..............................................................................12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Dawson v. City of Chi.*,
648 F. Supp. 2d 1057 (N.D. Ill. 2009) ...................................................................10

*Dorsey v. Morgan Stanley*,
507 F.3d 624 (7th Cir. 2007) .................................................................................6

*E.E.O.C. v. Concentra Health Servs., Inc.*,
496 F.3d 773 (7th Cir. 2007) ...............................................................................12

*Ezell v. Potter*,
400 F.3d 1041 (7th Cir. 2005) .............................................................................10

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998) .............................................................................................10

*Ford v. Marion Cnty. Sheriff's Off.*,
942 F.3d 839 (7th Cir. 2019) .................................................................................8

*Gawley v. Ind. Univ.*,
276 F.3d 301 (7th Cir. 2001) ...............................................................................11

*Hobbs v. City of Chi.*,
573 F.3d 454 (7th Cir. 2009) ...............................................................................13

*Hypolite v. Kankakee Cnty. Hous. Auth.*,
No. 05-2274, 2007 WL 399021 (C.D. Ill. Feb. 1, 2007) .......................................9

*Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*,
988 F.3d 948 (7th Cir. 2021) .........................................................................12, 14

*Indest v. Freeman Decorating, Inc.*,
164 F.3d 258 (5th Cir. 1999) ...............................................................................12

*Jackson v. Cnty. of Racine*,
474 F.3d 493 (7th Cir. 2007) ...............................................................................11

*Karriem v. Gen. Servs. Admin.*,
No. 17 C 2572, 2018 WL 6179089 (N.D. Ill. Nov. 27, 2018) ..............................14

*Khungar v. Access Cmty. Health Network*,
985 F.3d 565 (7th Cir. 2021) ...............................................................................14

*Kidwell v. Eisenhauer*,
679 F.3d 957 (7th Cir. 2012) ...............................................................................14

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Lesiv v. Ill. Cent. R.R. Co.*,
   39 F.4th 903 (7th Cir. 2022) ...................................................................13, 15

*Lucas v. Chi. Transit Auth.*,
   367 F.3d 714 (7th Cir. 2004) ...........................................................................8

*Mack v. City of Chi.*,
   No. 14 C 2943, 2015 WL 6445407 (N.D. Ill. Oct. 23, 2015) .................................11

*Magyar v. St. Joseph Reg'l Med. Ctr.*,
   544 F.3d 766 (7th Cir. 2008) .........................................................................11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ......................................................................................6

*Milligan-Grimstad v. Stanley*,
   877 F.3d 705 (7th Cir. 2017) ...........................................................................8

*Nelson v. Idleburg*,
   No. 18 CV 2839, 2020 WL 2061555 (N.D. Ill. Apr. 29, 2020).............................10

*Oenning v. Caremark, Inc.*,
   No. 01 C 462, 2001 WL 1230622 (N.D. Ill. Oct. 11, 2001)..................................8

*Ortiz v. Werner Enters., Inc.*,
   834 F.3d 760 (7th Cir. 2016) .........................................................................12

*Place v. Abbott Lab'ys*,
   215 F.3d 803 (7th Cir. 2000) .........................................................................13

*Rhoads v. Rieth–Riley Constr. Co.*,
   No. 11–CV–366, 2013 WL 1281749 (N.D. Ind. Mar. 26, 2013) ..........................14

*Rogers v. DeJoy*,
   No. 19 C 5389, 2021 WL 4318083 (N.D. Ill. Sept. 23, 2021)..............................14

*Sanders v. AeroCare USA, Inc.*,
   No. 17-CV-1543, 2017 WL 6001489 (C.D. Ill. Dec. 4, 2017) ..............................10

*Sanford v. Walgreen Co.*,
   No. 08-CV- 6325, 2009 WL 3152795 (N.D. Ill. Sept. 23, 2009) ...........................7

*Savino v. C.P. Hall Co.*,
   199 F.3d 925 (7th Cir. 1999) .........................................................................11

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Scruggs v. Garst Seed Co.*,
   587 F.3d 832 (7th Cir. 2009) .................................................................8

*Stanfield v. Dart*,
   No. 10 C 6569, 2012 WL 6720433 (N.D. Ill. Dec. 27, 2012) .................................11

*Stephens v. Erickson*,
   569 F.3d 779 (7th Cir. 2009) ................................................................12

*Stutler v. Ill. Dep't of Corr.*,
   263 F.3d 698 (7th Cir. 2001) ................................................................13

*Swyear v. Fare Foods Corp.*,
   911 F.3d 874 (7th Cir. 2018) ..................................................................8

*Thompson v. Mem'l Hosp. of Carbondale*,
   625 F.3d 394 (7th Cir. 2010) ................................................................13

*Tri-Gen Inc. v. Int'l Un. of Oper. Engineers, Local 150, AFL-CIO*,
   1024, 1030 (7th Cir. 2006).....................................................................6

*Triplett v. Starbucks Coffee*,
   No. 10 C 5215, 2011 WL 3165576 (N.D. Ill. July 26, 2011) ...................................9

*Whittaker v. N. Ill. Univ.*,
   424 F.3d 640 (7th Cir. 2005) ................................................................13

*Williams v. Bristol-Myers Squibb Co.*,
   85 F.3d 270 (7th Cir. 1996) .................................................................11

*Williams v. Waste Mgmt. of Ill., Inc.*,
   361 F.3d 1021 (7th Cir. 2004) .................................................................7

*Winters v. Hamos*,
   No. 16-CV-10777, 2018 WL 3458266 (N.D. Ill. July 18, 2018).................................9

*Zayas v. Rockford Mem'l Hosp.*,
   740 F.3d 1154 (7th Cir. 2014) ................................................................9

*Zerante v. DeLuca*,
   555 F.3d 582 (7th Cir. 2009) .................................................................6

**STATUTES**

775 Ill. Comp. Stat. 5/7A-102(A)(1) ..............................................................7

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

**RULES**

Fed R. Civ. P. 56..................................................................................................6

Local Rule 7.1(D)(1)(b)........................................................................................1

## I.     INTRODUCTION

The foundation of Plaintiff Derick Brown's claim against the University of Illinois Urbana-Champaign (the "University") rests on a single incident from 2015 in which his coworker allegedly donned a hood (which Brown claims was a "KKK hood") and his supervisor laughed. Brown did not complain about this incident for more than *two years*.  When Brown finally complained in July 2017 (the first time he *ever* mentioned race discrimination to the University), the University promptly and thoroughly investigated the matter and took remedial measures so that he would not work with or for that supervisor any longer. Since then, Brown has not been subject to any material adverse employment action. Accordingly, his claims for hostile work environment (Count I) and retaliation (Count III) under Title VII fail as a matter of law.

Notably, Brown's failure to identify support for his claims is not due to a lack of effort on his part.  The Parties engaged in extensive discovery over a two-year period. The University made fourteen distinct productions of more than 4,000 documents totaling more than 30,000 bates-stamped pages. The University ran search terms requested by Plaintiffs' counsel against a database with millions of files. Despite scouring the entire University for discovery, Brown has not unearthed a single, material factual dispute that would preclude summary judgment.

## II.     FACTUAL BACKGROUND[1]

### A.     Brown's employment with the University.

Plaintiff Derick Brown is a machinist in the University's Facilities and Services ("F&S") Department. (Defendant's Local Rule 7.1(D) Statement of Undisputed Material Facts ("SOF") ¶ 44).[2] He has worked for the University since 2004. (*Id*.). At all times during Brown's employment, the University maintained a Non-Discrimination Policy ("NDP"), along with the University's Code of Conduct, and an Office for Access and Equity ("OAE") charged with investigating

---

[1] The University accepts these facts as true for purposes of this Motion but reserves the right to contest any facts should this Motion be denied.
[2] Given the number of undisputed material facts common to all Plaintiffs, the University has filed one Statement of Undisputed Material Facts that applies to all three Motions for Summary Judgment.  In this Memorandum, the University identifies the material facts applicable to Brown, per Local Rule 7(D)(1)(b).

allegations of violations of these policies.[3]  Employees thus had multiple avenues for employees to raise complaints of harassment and discrimination. (SOF ¶¶ 35–43). All University employees, including Brown, were presented annually with the University's NDP and its reporting procedures through an email from the Chancellor, as well as through annual Title IX training. (*Id*.  ¶ 67).

### B.    The University promptly remediates Brown's interpersonal conflicts with McCoy.

From 2013 to July 2017, Brown was supervised by Chris McCoy. (*Id*. ¶ 44).  Brown and McCoy had a few interpersonal conflicts, and Human Resources for the F&S department successfully mediated their conflicts on several occasions. (SOF ¶ 45). First, on May 26, 2016, Brown alleges that McCoy checked on him at a jobsite and reprimanded him when McCoy found Brown had not started the job yet. (*Id*.). In a meeting about the incident on June 2, 2016, Brown admitted that he should have started working sooner and that he understood that McCoy was just doing what he was instructed to do. (*Id*.). Brown did not complain of racial discrimination at the time. (*Id*.).

Near the end of April 2017, Brown approached Melvin Boatner, a F&S HR official, and expressed frustrations that McCoy was disrespecting him. (*Id*. ¶ 46). On the same day, Brown approached Boatner and Pam Voitik, director of Operations, Management, and Alterations ("OMA"), and scheduled a meeting later in the week to discuss his frustrations. (*Id*.). On May 2, 2017, a meeting was held with McCoy, Brown, Ken Buenting, the Assistant Superintendent of Building Maintenance and Repairs at F&S, and Voitek and Boatner. (*Id*. ¶ 47). Brown said to McCoy that, while he liked him, he felt like McCoy was disrespectful towards him sometimes. (*Id*.). McCoy responded that was not his intention, he apologized, and explained that he likes to joke around and understands that it can get out of hand. (*Id*.). In the meeting, Brown did not attribute the alleged disrespect to race. (*Id*.). On May 25, 2017, a follow-up meeting was held with the same people as the May 2 meeting to check the progress between Brown and McCoy. (*Id*. ¶

---

[3] During the relevant period of this litigation, OAE changed its name from the Office of Diversity, Equity and Access ("ODEA") and some of the documents and exhibits refer to that earlier title. For convenience, the office is referenced as OAE throughout.

48). Brown stated that he thought things were getting better but expressed concerns about his work assignments. (*Id.*). McCoy responded that he thinks Brown is a good hand in the shop but could improve his self-confidence. (*Id.*). At no point during any of these meetings or conversations did Brown complain of race discrimination. (*Id.* at ¶¶ 45-48).

### C.   Brown complains of discrimination for the first time in July 2017 and the University initiates and completes a prompt, thorough investigation.

Brown's first complaint of race discrimination occurred in July of 2017.  (*Id.* ¶ 49). More specifically, on July 13, 2017, Buenting brought Brown into the OMA's office because Brown was upset again about his job. (*Id.*). Brown stated in the meeting that he "feels there is racism." (*Id.*). According to an email memorializing the conversation written by Boatner at the time, Brown expressed that he had only experienced racism in the shop during the past month-and-a-half (and not in the 13 years prior). (*Id.*). Brown admitted at his deposition that this was the first time he mentioned racism in the machine shop to HR or any University official. (*Id.*).

During the meeting, Brown described an incident in Summer 2015 (over two years prior) in which McCoy laughed as one of Brown's coworkers placed a white rag found on the jobsite over his head (the "Hood Incident"). (*Id.* ¶ 50).  Brown did not report the incident to F&S management, Human Resources ("HR"), or OAE at the time it occurred. (*Id.*). When asked more questions about the Hood Incident, Brown said he had said too much already, that his coworker was just fooling around, and it was not a mean thing.  (*Id.*). Brown immediately asked the officials to forget what he said about the Hood Incident, to which an HR official explained that the department does not work this way and they would report it. (*Id.*).

Despite Brown's characterization, the University recognized the potential gravity of his allegations and began to investigate immediately. The following day, July 14, 2017—a Friday—senior executives from Facilities & Services and HR met to discuss Brown's allegation. (*Id.* ¶ 51). The group decided that McCoy should be placed on administrative leave while University officials looked deeper into the Hood Incident. (*Id.*). McCoy's administrative leave began the following Monday, July 17, 2017. (*Id.*).

On July 17, 2017, Brown met with Jennie Duran, an OAE Investigator, to discuss his claims against McCoy, in which he shared the same information he did in the July 13 meeting. (*Id*. ¶ 52). Shortly after his meeting with OAE, Brown had discussions with F&S management about changing positions from the machine shop to the tool room when McCoy returned from his administrative leave. (*Id*. ¶ 53). Brown was "appreciative of the new assignment," (*Id*. ¶ 53), because it got him out of the machine shop, it made sense because he had worked in the tool room before, (*id*.), and the pay was the same,  (*id*.). Brown has worked in the tool room since then. (*Id.*).

Meanwhile, OAE's investigation promptly ensued. During the investigation, Brown claimed the hood from the Hood Incident was intended to resemble a "KKK hood." (*Id*. ¶ 54). Brown also described several instances in 2017 where he believed McCoy insulted him and displayed a hostile attitude. (*Id*.). The only examples provided by Brown included: McCoy telling Brown that he should know how to better do his job after 13 years of experience, (*id*.), McCoy joking that he wishes Brown won't have enough gas to return to work after vacation, (*id*.), McCoy displaying insensitivity when Brown went to a funeral, while allegedly later providing a grieving white coworker a condolence card, (*id*.), and McCoy calling him "stupid," "lazy," and "boy" in front of his coworkers. (*Id*.). Brown also indicated he believed he was given unfavorable work assignments. (*Id*.)

On October 5, 2017, Duran concluded her investigation on behalf of OAE. (*Id*. ¶ 55). Her investigation included interviews with Brown, McCoy, and other witnesses, in addition to the review of relevant documentary evidence. (*Id*.)

Duran determined that "the crux" of Brown's complaints were unrelated to treatment based on his race, and instead related to crude comments directed at Brown by a person who "yelled profanities to other people . . . regardless of their race or protected category."  (*Id*. ¶ 56). OAE found McCoy's conduct did not meet the standards needed to state a claim for racial harassment under the University's non-discrimination policy. (*Id*.). However, the evidence did show a violation of the spirit of the University's Code of Conduct Policy. (*Id*. ¶ 42).

The OAE report took much into consideration when determining that McCoy's conduct did not violate the non-discrimination policy. For example, McCoy denied that he ever witnessed the Hood Incident as did all other alleged witnesses besides one, who described seeing "maybe two people with white sheets." (*Id*. ¶ 57). Another witness stated that employees regularly place cloth on their face when working to avoid falling particles but did not recall this specific incident. (*Id.*). Ultimately, OAE concluded there was insufficient evidence to demonstrate the existence of a KKK mask. (*Id*.).

McCoy affirmed that he was giving Brown less responsibility. (*Id*. ¶ 58). But he had a legitimate explanation:  the department was losing jobs due to Brown's inability to properly seal mechanical parts. (*Id*.). Regarding Brown's allegations of McCoy's insults and name-calling, McCoy acknowledged that he had lost his temper and yelled at Brown about his performance in the past. (*Id*. ¶ 59). OAE determined that while this kind of conduct violates the spirit of the University's Code of Conduct Policy, it is not based in a protected classification, and therefore does not apply to a non-discrimination policy violation analysis. (*Id*.).

While OAE found that McCoy's conduct did not meet the standards needed for a racial harassment claim under the University's policy, it still strongly recommended that the F&S department pursue discipline appropriate for this type of behavior and to engage in training to address non-discrimination. (*Id*. ¶ 60). OAE also strongly cautioned the department against any kind of retaliation. (*Id*.).

In response to the recommendation of OAE to punish McCoy, F&S entered into an agreement with McCoy that allowed him to return to work at F&S but demoted him from his supervisor position and removed the possibility of any future promotion to a supervisory role.  (*Id*. ¶ 61).

**D.      Brown was not subjected to any form of retaliation.**

Brown has experienced only one documented performance issue since initiating his complaint of discrimination in July 2017. On May 9, 2019, Brown's new supervisor, Stuart De

Haro, documented that Brown had left work without authorization. (*Id*. ¶ 62). Brown indicated he was aware of the rules regarding remaining at his assigned place of work, understood that he left without authorization, and agreed not to do so again. (*Id*.).[4] De Haro explained to Brown this incident was not "formal discipline," and that he would "not place notice in [Brown's] personnel file at Illinois Human Resources." (*Id*.). There is no other evidence—from Brown or anyone else— that De Haro or any other decisionmaker recorded this incident or took any other action because of retaliatory animus toward Brown.

### III.    ARGUMENT

#### A.    Standard of Review.

Summary judgment will be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Advisory Comm. Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. App., p. 626). Ultimately, summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Carter v. Pension Plan Of A. Finkl & Sons Co. For Eligible Off. Emps.*, 654 F.3d 719, 727–28 (7th Cir. 2011).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007). Additionally, "[a] party that bears the burden of proof on a particular issue cannot rest its case on the pleadings, but must demonstrate by specific factual allegations that there is a genuine issue of material fact that requires a trial." *Tri-Gen Inc. v. Int'l*

---

[4] Notably, Brown acknowledges that de Haro has never used racial epithets or derogatory language about his race. (*Id*. ¶ 62).

6

*Un. of Oper. Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1030 (7th Cir. 2006). If the evidence favoring the non-moving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

The *only* two causes of action remaining are Brown's individual claims of hostile work environment and retaliation under Title VII of the Civil Rights Act. Brown's other claims were either dismissed or waived.[5] (SOF ¶ 16). Each remaining claim fails as a matter of law.

**B.    Plaintiff's Hostile Work Environment Claim Fails.**

A hostile work environment exists when a workplace is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of … employment." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). Brown must show that "he was subject to unwelcome harassment … based on his race," "the harassment was severe or pervasive," and "a basis for employer liability." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004).

*1.    The foundational incident underlying Plaintiff's hostile work environment claim is time-barred.*

In the context of hostile work environment claims, courts only consider allegations of discrimination that fall outside of the statute of limitation (*i.e.*, more than 300 days prior to the filing of a plaintiff's EEOC charge) if they qualify as a "continuing violation," *i.e.*, "the acts involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Sanford v. Walgreen Co.*, No. 08-CV-6325, 2009 WL 3152795, at *5 (N.D. Ill. Sept. 23, 2009).

Here, Brown filed his EEOC charge on December 19, 2017. (SOF ¶ 61). But the primary incident upon which he bases his Title VII hostile work environment claim—the Hood Incident—

---

[5] The Court dismissed Plaintiffs' claims under the Illinois Civil Rights Act and noted their state-law discrimination claims would need to be filed under the Illinois Human Rights Act ("IHRA"), if at all. Plaintiffs never sought to amend their Amended Complaint and any attempt to do so would be time-barred under the IHRA. *See* 775 Ill. Comp. Stat. 5/7A-102(A)(1).

occurred in Summer 2015, *over two years earlier*. (*Id.* ¶ 50). It is not part of a "continuing violation." Brown has not (and cannot) cited any other incidents involving the co-worker allegedly involved and McCoy. And apart from unspecified occasions when McCoy referred to Brown as a "boy," the remaining allegations about McCoy claim he was generally hostile beginning at some unspecified point in 2016 (the following year). (*Id.* ¶ 45–47, 59). Brown cannot demonstrate any reasonable link between the timely and untimely conduct he alleges. Indeed, undated and/or otherwise non-specific allegations are insufficient to do so. *See Lucas v. Chi. Transit Auth.*, 367 F.3d 714 (7th Cir. 2004); *Milligan-Grimstad v. Stanley*, 877 F.3d 705 (7th Cir. 2017). Accordingly, given the passage of time between the Hood Incident and the remainder of alleged conduct, the Hood Incident cannot and should not be considered in assessing the viability of Brown's hostile work environment claim. *See, e.g.*, *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019) ("The simplest factor is time: A significant gap between alleged incidents of discriminatory harassment can sever the hostile work environment claim. There is no magic number; the question is whether the series of allegations describe continuous conduct rather than isolated incidents.") (citation omitted).

### 2. *Brown was not subjected to a hostile work environment.*

The undisputed evidence also demonstrates that the conduct at issue was not severe, pervasive or attributable to Brown's race. When a court evaluates such conduct, factors to be considered include the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance. *See Scruggs v. Garst Seed Co.,* 587 F.3d 832, 840 (7th Cir. 2009)*.* "We . . . assume employees are generally mature individuals with the thick skin that comes from living in the modern world. As a result, employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) (citation omitted); *see also Scruggs*, 587 F.3d at 840; *Oenning v. Caremark, Inc.*, No. 01 C 462,

2001 WL 1230622, at *1 (N.D. Ill. Oct. 11, 2001), at *3–4 ("A certain amount of vulgar banter . . . is inevitable in the modern workplace . . . .").

Here, none of the alleged conduct at issue is sufficiently severe or pervasive to establish a hostile work environment claim.

*First*, most of the conduct at issue has no discernable connection to any protected category. Brown's bare claims that he was treated differently than unspecified white colleagues by virtue of receiving undesirable assignments, a performance criticism (he admitted was valid), and being subjected to a rude comment about a death in his family cannot establish a claim of hostile work environment. *See, e.g., Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) (affirming summary judgment in favor of the employer in a hostile work environment claim because allegations of racial harassment must have "*some* [*sic*] connection, for 'not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority'"); *Hypolite v. Kankakee Cnty. Hous. Auth.*, No. 05-2274, 2007 WL 399021, at *5 (C.D. Ill. Feb. 1, 2007) (noting that plaintiff's allegations that they were overworked due to their race were not supported by evidence that other employees worked less or that her job responsibilities were connected to her race); *Triplett v. Starbucks Coffee*, No. 10 C 5215, 2011 WL 3165576, at *5 (N.D. Ill. July 26, 2011) (dismissing hostile work environment claim where the plaintiff alleged, among other things, she was subjected to a racially insensitive comment and "racially-based disciplinary actions, where she was disciplined more severely than similarly situated white employees"); *see also Winters v. Hamos*, No. 16-CV-10777, 2018 WL 3458266, at *4 (N.D. Ill. July 18, 2018) (holding claims of, among things, "baseless poor reviews," an "excessive workload" and a suspension supported claims of discrimination, not hostile work environment). Courts routinely reject hostile environment claims based on mere personality clashes between workers. *See e.g.*, *Abrego v. Wilkie*, 907 F.3d 1004, 1015–16 (7th Cir. 2018) (holding that being "subjected to excessive monitoring" by supervisors who were "short tempered, hostile, unfairly critical, and disrespectful" did not create a hostile work environment); *Atanus v. Perry*, 520 F.3d 662, 676 (7th Cir. 2008) ("[A] loud, unprofessional tone

during one meeting does not satisfy the requirement that the offensive conduct be severe [or] pervasive."). In other words, at the summary-judgment stage, Brown must proffer evidence "connecting" the allegedly harassing "incident[s] to his race." *Nelson v. Idleburg*, No. 18 CV 2839, 2020 WL 2061555, at *10 (N.D. Ill. Apr. 29, 2020). He cannot.

*Second*, general allegations about McCoy's hostility do not establish pervasive, discriminatory conduct for purposes of a hostile work environment claim. *See Ezell v. Potter*, 400 F.3d 1041, 1048 (7th Cir. 2005) ("Of course, a regular basis could be daily, weekly, monthly or even yearly; [plaintiff] provides no detail on the regularity and so we cannot consider the few comments detailed in the briefs to be pervasive."). Brown makes no meaningful attempt to quantify McCoy's alleged hostility and instead only describes it in conclusory terms. (SOF ¶¶ 46–47, 59).

*Third*, even if the Court considers the Hood Incident and credits Brown's recharacterization of it as racially insensitive many years after the fact, this alone is insufficiently severe or pervasive to create a hostile work environment.  *See*, *e.g.*, *Sanders v. AeroCare USA, Inc.*, No. 17-CV-1543, 2017 WL 6001489, at *3 (C.D. Ill. Dec. 4, 2017) (holding that a single use of a racial epithet directed at and overheard by the plaintiff was insufficient to show severe or pervasive harassment in the workplace);  *Dawson v. City of Chi.*, 648 F. Supp. 2d 1057, 1069 (N.D. Ill. 2009) (holding that the one-time use of a racial epithet by a coworker and a separate incident of staring were insufficient to show severe or pervasive harassment as required for employer liability under a hostile work environment claim).

Because none of the conduct at issue amounts to hostile work environment under Title VII, Brown's claim cannot survive summary judgment.

### 3.    There is no basis to hold the University liable for a hostile work environment.

Even if Brown could somehow establish that he was subjected to a pattern of severe or pervasive racial harassment, his claim cannot proceed because he unreasonably failed to take advantage of any preventive or corrective opportunities the University provided. *Faragher v. City*

*of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998).

Brown waited over two years to bring the Hood Incident to the University's attention. (SOF ¶ 50). Courts within this circuit have routinely found plaintiffs unreasonably failed to take advantage of remedial measures for much shorter lapses. *Jackson v. Cnty. of Racine*, 474 F.3d 493, 502 (7th Cir. 2007) (holding that the plaintiffs had unreasonably failed to call the employer's attention to alleged harassment and correspondingly affirming summary judgment based on the *Faragher-Ellerth* defense because "[i]t was not until four months after [the alleged harasser] became manager that any of the plaintiffs first complained to [the employer] about his behavior"); *Gawley v. Ind. Univ.*, 276 F.3d 301, 312 (7th Cir. 2001) (dismissing Title VII claim where plaintiff had failed to complain about harassment for seven months); *Mack v. City of Chi.*, No. 14 C 2943, 2015 WL 6445407, at *4 (N.D. Ill. Oct. 23, 2015) (noting that plaintiffs had unreasonably waited five months to complain about harassment). Without the Hood Incident, Brown's generalized claims of hostility (which were also promptly and thoroughly investigated) cannot sustain a hostile work environment claim. *See* Section B(2), *supra*.

Moreover, as the Supreme Court recognized in *Faragher and Ellerth*, where, as here, the alleged harassment has not culminated in a tangible employment action and the employee unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided,[6] the University cannot be liable for McCoy's conduct if it "exercised

---

[6] Brown's voluntary reassignment does not constitute a tangible employment action for purposes of Title VII employer liability because the reassignment was voluntary and did not significantly alter Brown's responsibilities or benefits. (SOF ¶ 53). For an employer to have taken a tangible employment action against a plaintiff, there must have been a significant change in the employee's employment status and that change must have "cause[d] a substantial detriment to the plaintiff's employment relationship." *Stanfield v. Dart*, No. 10 C 6569, 2012 WL 6720433, at *6 (N.D. Ill. Dec. 27, 2012) (citing *Savino v. C.P. Hall Co.*, 199 F.3d 925, 932 (7th Cir. 1999)). For reassignment to constitute a tangible employment action, it must significantly alter an employee's responsibilities or entitlements. *See Stanfield*, 2012 WL 6720433, at *6 (citing *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996)) ("[A] transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action."); *see also Savino*, 199 F.3d at 937 n.8 ("Savino did not suffer a tangible employment decision because reassignment to a comparable office is neither sufficiently adverse nor significant."). Here, Brown retained his title and the same pay. (SOF ¶ 53). Simply put, there were no negative consequences from the reassignment.

reasonable care to prevent and correct harassment." *Magyar v. St. Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 n.1 (7th Cir. 2008).

Here, the University's remedial measures were not only sufficient, they were also effective. To start, the University had an anti-harassment and reporting policy, which Brown utilized to report McCoy's alleged comment. (SOF ¶¶ 46–64). After Brown did so, the University promptly responded and investigated the complaint, and McCoy was immediately suspended (and ultimately reinstated to a non-supervisory position). (*Id.* ¶ 61). The University also permitted Brown to be reassigned to the tool room, where he was separated from McCoy. (*Id.* ¶ 53). The University thus took reasonably prompt and adequate corrective action in response to Brown's complaint and McCoy's conduct cannot be imputed to the University. *See, e.g., Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 265–66 (5th Cir. 1999) ("Imposing vicarious liability on an employer for a supervisor's "hostile environment" actions despite its swift and appropriate remedial response to the victim's complaint would thus undermine . . . Title VII's deterrent policy.").

### C.     Brown's Retaliation Under Title VII Fails as a Matter of Law.

To defeat summary judgment, Brown "must present evidence which, taken as a whole, 'would permit a reasonable factfinder to conclude" that retaliation caused the adverse actions at issue. *Bless v. Cook Cnty. Sheriff's Off.*, 9 F. 4th 565, 574 (7th Cir. 2021) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); *Igasaki v. Ill Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (noting applicable legal frameworks). To prove retaliation under Title VII, Brown must show (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by the University; and (3) a causal connection exists between the two. *Stephens v. Erickson*, 569 F.3d 779, 786–87 (7th Cir. 2009) (citation omitted).

Unlike discrimination claims under Title VII, which are evaluated under a "motivating factor" standard, retaliation claims require proof of "but-for" causation. *See Cung Hnin v. TOA*

12

*(USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014). Brown's retaliation claim fails as a matter of law because he has not suffered an adverse employment action.[7]

> *1.     Brown was not subject to a material, adverse employment action.*

Here, as a threshold matter, Brown cannot prove that he suffered a "materially adverse" action, which "must materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). An action is not materially adverse when the plaintiff merely experienced "trivial harms such as petty slights or minor annoyances that often take place at work and that all employees experience." *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 912 (7th Cir. 2022); *see also Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 406 (7th Cir. 2010) ("The idea behind requiring proof of an adverse employment action is simply that a statute which forbids employment discrimination is not intended to reach every bigoted act or gesture that a worker might encounter in the workplace."). Indeed, an action that does not actually "harm" the plaintiff cannot sustain a retaliation claim. *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006).

To start, Brown's 2019 performance write-up for leaving work without authorization does not qualify as an adverse action. (SOF ¶ 62). Disciplinary measures or reprimands alone do not constitute materially adverse actions when they "did not result in tangible job consequences" such as discharge or denial of job benefits. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). Nor does his transfer to the tool room. (SOF ¶ 53). Indeed, "[b]eing moved from one job to another also does not meet the test." *Place v. Abbott Lab'ys*, 215 F.3d 803 (7th Cir. 2000); *see also Hobbs v. City of Chi.*, 573 F.3d 454, 463 (7th Cir. 2009) ("[Plaintiff's] only argument concerns assignments that were clearly within her job duties. She did not point to any evidence that she suffered loss of a job title or received less pay. A materially adverse action must be 'more

---

[7] "Precedent confirms that a plaintiff . . . alleging illegal retaliation on account of protected conduct must provide some specific description of that conduct beyond the mere fact that it is protected." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 781 (7th Cir. 2007). To the extent Brown attempts to rely on conclusory allegations about his complaints of discrimination, he cannot survive summary judgment.

disruptive than a mere inconvenience or an alteration of job responsibilities.'"); *Collins v. Meike*, 52 F. App'x 835, 837 (7th Cir. 2002) (temporary reassignment did not qualify as adverse action); *Whittaker*, 424 F.3d at 647 (finding no adverse action where plaintiff "voluntarily left her job"). Lastly, Brown's claims about his coworkers' alleged incivility do not save his claim. (SOF ¶ 63). *See Brown v. Advoc. S. Suburban Hosp.*, 700 F.3d 1101, 1107–08 (7th Cir. 2012) (collecting cases and holding that a coworker's incivility, name-calling, and threatening statement that "paybacks are hell" would not dissuade a reasonable person from complaining of discrimination); *Rhoads v. Rieth–Riley Constr. Co.*, No. 11–CV–366, 2013 WL 1281749, at *19 (N.D. Ind. Mar. 26, 2013) (holding that a coworker's encroachment of the plaintiff's physical space would not dissuade a reasonable person from making a charge of discrimination). Accordingly, because Brown was not subject to a materially adverse action, his retaliation claim fails as a matter of law.

### 2.   *Brown's performance write-up was not due to his protected activity.*

Even if the Court were to determine Brown's performance write-up qualified as an adverse action (it does not), the lone write-up cannot be attributed to his protected activity. The write-up was issued by a different supervisor (De Haro) well over a *year* after his last act of protected activity. (SOF ¶ 62).  *See, e.g., Karriem v. Gen. Servs. Admin.*, No. 17 C 2572, 2018 WL 6179089, at *8 (N.D. Ill. Nov. 27, 2018) (granting summary judgment and holding that an unexplained four-month delay between the protected activity and the alleged retaliation was "too long to support an inference of retaliation" for establishing causation). *See also Igasaki*, 988 F.3d at 959–60 (affirming summary judgment on a Title VII retaliation claim and holding that "the two-month gap between [plaintiff's] protected activities and his termination cannot show retaliation on its own"); *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 578–79 (7th Cir. 2021) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (citations omitted) (affirming summary judgment on a Title VII retaliation claim when the protected activities "occurred more than a year and more than six months before her termination, respectively," because under Seventh Circuit precedent, courts "typically allow no more than a few days to elapse between the protected activity and the adverse action" to show causation); *Arnold v. Visiontek Prod.*, LLC, 748 F. App'x 59, 62

(7th Cir. 2019) (affirming summary judgment on a Title VII retaliation claim when "the only circumstantial evidence is that [defendant] fired [plaintiff] about one month after" plaintiff's protected activity and noting that "[t]hat timing, alone, is not sufficiently suspicious to create an inference of retaliation"); *Rogers v. DeJoy*, No. 19 C 5389, 2021 WL 4318083, at *7–8 (N.D. Ill. Sept. 23, 2021) (citing *Igasaki*., 988 F.3d at 959–60) (granting summary judgment against a plaintiff's Title VII retaliation claim and holding that plaintiff was unable to establish causation when "almost nine months had elapsed between her protected activity and the adverse action"). Moreover, uncontested written documentation prepared at the time of the incident reveals that Brown freely admitted his mistake, and there is no evidence the write-up is false. (SOF ¶ 62). Nor has Brown offered any examples of employees with similar failings who did not engage in protected activity and received less severe consequence. *Abrego*, 907 F.3d at 1013 (citing *Burks v. Wis. Dept. of Transp.*, 464 F.3d 744, 750–51 (7th Cir. 2006) ("We have cautioned that, in order to show that a coworker is similarly situated . . . the employee must show that the other coworker had a 'comparable set of failings.'")); *see also Lesiv*, 39 F.4th at 919 (affirming summary judgment for the defendant when the "[plaintiff's] comparator evidence could not support a finding that [defendant] acted with a retaliatory motive").

## IV.    CONCLUSION

For the reasons stated above, the Court should grant the University's Motion for Summary Judgment as to Plaintiff Derick Brown's claims (Counts I and III).

Dated: April 3, 2023                              Respectfully Submitted,


                                                 **DEFENDANT THE UNIVERSITY OF
                                                 ILLINOIS**


                                                 By:      */s/ Christopher B. Wilson*
                                                          One of Its Attorneys

                                                          Christopher B. Wilson
                                                          Jonathan R. Buck
                                                          **PERKINS COIE LLP**
                                                          110 North Wacker, Suite 3400
                                                          Chicago, IL 60606-1511
                                                          Tel: (312) 324-8400
                                                          Fax: (312) 324-9400
                                                          cwilson@perkinscoie.com
                                                          jbuck@perkinscoie.com

## CERTIFICATE OF SERVICE

I, Christopher B. Wilson, certify that on April 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 3rd day of April, 2023.

*s/ Christopher B. Wilson*
Christopher B. Wilson
Jonathan R. Buck
**PERKINS COIE LLP**
110 North Wacker, Suite 3400
Chicago, IL 60606-1511
Tel: (312) 324-8400
Fax: (312) 324-9400

*One of the Attorneys for Defendant University of Illinois*

17