# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| DERICK BROWN, ATIBA FLEMONS, and JEFFREY TAYLOR, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:19-cv-2020 |
| v. | ) ) | |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | ) ) ) | |
| Defendant. | ) ) | |

## ORDER

This matter is before the Court on three unopposed Motions for Summary Judgment filed by Defendant, the Board of Trustees of the University of Illinois, against Plaintiffs Derick Brown (doc. 80), Atiba Flemons (doc. 82), and Jeffrey Taylor (doc. 84). For the following reasons, Defendant's Motions are granted.

### BACKGROUND

Plaintiffs are three black employees who currently work at Defendant's Urbana-Champaign campus ("UIUC" or "the University"). In an Amended Complaint filed on February 19, 2019, Plaintiffs charged Defendant with discrimination against black employees in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Illinois Civil Rights Act ("ICRA"). (Doc. 4). Plaintiffs filed this putative class-action lawsuit on behalf of themselves and their colleagues to seek redress. In their Amended Complaint, Plaintiffs asserted claims for hostile work environment (Count I), which were also

asserted on behalf of a putative class, and retaliation (Count III) under Title VII and ICRA (Counts II and IV). Flemons and Taylor also asserted claims for disparate treatment under those same statutes (Counts V and VI).

On June 7, 2019, Defendant filed a Motion to Dismiss Plaintiffs' Amended Complaint. (Doc. 12). In Plaintiffs' Response, they stated they would not pursue disparate treatment claims (Counts V and VI). (Doc. 18 at 1, 27, and 29); *see also* Text Order dated Aug. 8, 2019, denying Defendant's Motion to Dismiss ("The court would also note that Plaintiffs, in their Response 18 at page 1, confirmed that they are not pursuing any disparate treatment claims, and are pursuing only hostile work environment and retaliation claims under Title VII and the ICRA.").

On March 3, 2022, Plaintiffs moved for class certification. (Doc. 58). This Court denied Plaintiffs' Motion, holding they failed to prove commonality and typicality under Federal Rule of Civil Procedure 23(c). (Doc. 74).

On July 20, 2022, this Court dismissed Plaintiffs' claims under ICRA (Counts II and IV) in light of the Court's decision in *Kainz v. Ill. Dep't of Corr.*, No. 1:21-cv-01250 (C.D. Ill. May 25, 2022) (holding that employment discrimination claims against the Illinois government must be brought under the Illinois Human Rights Act rather than the ICRA). (Doc. 73).

On April 3, 2023, Defendant filed the instant Motions for Summary Judgment as to Plaintiffs' remaining individual claims of hostile work environment (Count I) and retaliation (Count III) in violation of Title VII. (Docs. 80, 82, and 84).

On June 2, 2023, Plaintiffs responded stating that they do not oppose Defendant's Motions for Summary Judgment on their individual claims. (Doc. 87 at 1).

## LEGAL STANDARDS

Summary judgment shall be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). All inferences drawn from the facts must be construed in favor of the non-movant. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011). However, the Court is "not required to draw every conceivable inference from the record"; the Court draws only reasonable inferences. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009) (quotations omitted).

To survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). If the evidence on record could not lead a reasonable jury to find for the nonmovant, then no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *See McClendon v. Ind. Sugars*, 108 F.3d 789, 796 (7th Cir. 1997). At the summary judgment stage, the court may not resolve issues of fact; disputed material facts

must be left for resolution at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

As previously stated, Plaintiffs do not oppose Defendant's Motions for Summary Judgment. Under the Central District of Illinois's Local Rule 7.1(D)(2), unopposed motions for summary judgment are deemed admitted. *See also Hunter v. Rock Island Hous. Auth.*, No. 4:13-cv-4017 (C.D. Ill. Apr. 21, 2015). Additionally, because Plaintiffs do not oppose Defendant's Motions, they have forfeited their opportunity to elaborate on the legal theories they presented in their Amended Complaint or to raise any new theories. *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (citing *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1220 (7th Cir. 1984)).

However, this does not mean that the motions are automatically granted; rather the Court is still obligated to consider each motion on its merits and determine whether judgment for Defendant would be legally appropriate. *See Pike v. Nick's English Hut, Inc.*, 937 F. Supp. 2d 956, 959 (S.D. Ind. 2013); *see also Johnson*, 35 F.3d at 1112 ("Even if the opposing party completely fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only 'if appropriate—that is, if the motion demonstrates that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.' ").

4

Discussion[1]

## I. Defendant's Motion for Summary Judgment against Brown

Brown began employment with the University in 2004 and is presently a machinist in the Facilities and Services Department. From 2013 to 2017, Brown, who is black, was supervised by Chris McCoy, who is white. Beginning in May 2016, Brown began reporting "frustrations" with McCoy to Human Resources. On May 26, 2016, Brown reported that McCoy appeared at his job assignment and reprimanded Brown for his failure to begin work in a timely manner. In a meeting with Human Resources officials on June 2, 2016, Brown admitted that he should have begun his job assignment sooner and he understood McCoy was monitoring his performance as his supervisor. Brown did not complain of racial discrimination.

In April 2017, Brown complained to officials in Human Resources that McCoy was being disrespectful toward him. He met with Human Resources officials on May 2, 2017. McCoy apologized to Brown, explaining he liked to joke and understood it could get out of hand. Brown did not complain of racial discrimination.

On May 25, 2017, officials met again with Brown and McCoy. Brown expressed his belief that the situation had improved but questioned his

---

[1] Because Plaintiffs do not oppose Defendant's Motions, the Court considers the Defendant's statement of facts undisputed. *See* Fed. R. Civ. P. 56(e)(2) ("If a party ... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion."); CDIL-LR 7.1(D)(2) ("A failure to respond will be deemed an admission of the motion [for summary judgment]."). Unless otherwise noted, the facts recited in this Order come from Defendant's statement of undisputed facts. (Doc. 86).

assignments. McCoy characterized Brown as a good hand in the shop but lacking confidence. Brown did not complain of racial discrimination.

On July 13, 2017, Brown met with officials and again expressed concern regarding his assignments. Brown then expressed for the first time that he felt "there is racism" in the machine shop. Brown reported an incident two years earlier in which McCoy laughed when a coworker placed a white rag—with cut-outs for eyes, nose, and mouth—over his head. Brown believed the white rag was meant to evoke the hoods worn by the Ku Klux Klan. According to Brown, a coworker pulled the large white rag from a bin. The rag was shaped "like the KKK hood." (Doc. 86-10 at 8). The coworker "cut the eyes out and the mouth and the nose and he put it over his head." (Doc. 86-10 at 8). When officials began questioning Brown regarding the incident, Brown advised University officials that the coworker "was just fooling around, and it was not a mean thing." (Doc. 86 at 10). Brown reported that he had laughed along with the other coworkers present but later felt uncomfortable about the incident. Brown stated that he did not want to say anything more and asked that officials disregard his report. University officials explained that they would report the incident. McCoy was placed on immediate administrative leave, and University officials discussed with Brown moving his employment from the machine shop to the tool room. Brown accepted the offer to move to the tool room and expressed appreciation for the new assignment.

The University's Office for Access and Equity ("OAE") initiated an immediate investigation of the white-rag incident that Brown alleged occurred in 2015. Brown

claimed the white rag was intended to resemble a "KKK hood." Brown identified additional instances of McCoy exhibiting an insulting and hostile attitude toward him in 2017. Brown alleged McCoy (1) told Brown he should know how to better do his job after 13 years of experience, (2) joked that he wished Brown would run out of gas while on vacation and not return to work, (3) exhibited insensitivity when Brown attended a funeral but provided a grieving white coworker a condolence card, and (4) called Brown "stupid," "lazy," and "boy" in front of his coworkers. Brown continued to assert he was given unfavorable work assignments.

The OAE concluded its investigation in September 2017 and issued a report on October 5, 2017. The report found insufficient evidence of "a KKK-style mask." McCoy denied he witnessed "the hood incident" as did others alleged to have been present. Only one individual recalled seeing "maybe two people with white sheets." Another individual stated that employees regularly place cloth on their face when working to avoid falling particles but did not recall this specific incident. The report determined that the remaining claims were unrelated to race but instead, related to crude comments directed at Brown by an individual (McCoy) who "yelled profanities to other people … regardless of their race or protected category." Although the OAE determined that this type of conduct was a gross violation of the University's Code of Conduct Policy, it did not meet the high standards needed to state a claim for racial harassment under the University's nondiscrimination policy. Following the issuance of the report, McCoy was returned to work in a nonsupervisory role with no opportunity to serve in a supervisory role in the future.

On December 19, 2017, Brown filed his Equal Employment Opportunity Commission ("EEOC") charge of discrimination.

**A. Hostile Work Environment**

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). A plaintiff may establish a violation under Title VII by proving that he was subjected to a race-based hostile work environment. See *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). To survive a summary judgment motion, Brown must show sufficient evidence demonstrating (1) his work environment was both objectively and subjectively offensive, (2) the harassment complained of was based on race, (3) the conduct was either severe or pervasive, and (4) there is a basis for employer liability. *See Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017). To determine whether an environment is objectively hostile, the court considers the totality of the circumstances. *See Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013). This includes (1) the frequency of the discriminatory conduct, (2) how offensive a reasonable person would deem it to be, (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse, (4) whether it unreasonably interferes with an employee's work performance, and (5) whether it is directed at the victim. *Id.* "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chicago*, 713 F.3d 325, 331 (7th Cir. 2013) (citation and quotation omitted). Finally, teasing, offhand comments, and

isolated incidents do not generally add up to a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). Instead, Title VII sets a high bar so that it does not become a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998).

As an initial matter, Defendant argues that Brown's hostile work environment claim is time-barred to the extent that it is based on the "primary incident," identified by Defendant as "the Hood Incident."

A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." *See* 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after an unlawful practice happened. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. *See id.*

The Court acknowledges that in *Tinner v. United Insurance Company of America*, the Seventh Circuit found a "two-year gap between allegedly discriminatory acts could not support a continuing violation claim." 308 F.3d 697, 708–09 (7th Cir. 2002) (citing *Selan v. Kiley*, 969 F.2d 560, 567 (7th Cir. 1992)). However, the *Tinner* court did not address the hostile work environment claim

brought by the plaintiff, instead focusing upon three discrete acts which Tinner claimed were acts of discrimination. The Supreme Court acknowledged in *Morgan* that a hostile work environment is one unlawful employment practice, that this one practice may occur over the course of years, and that a court may look to all component acts without regard to the 300-day statute of limitations. Thus, we consider whether all of Defendant's alleged conduct, taken as a whole, created an actionable hostile work environment.

Brown alleges that he was subjected to a racially hostile work environment while working in the University's machine shop under the supervision of McCoy. Brown references six incidents which purportedly show that the work environment was objectively hostile. The first was the 2015 hood incident and McCoy's alleged laughter in response to it. Four incidents involved verbal communications McCoy made to Brown in 2017: the comments that he should know how to do his job better after 13 years of experience and that he wished Brown would run out of gas while on vacation, the insensitive remarks directed at Brown after a family member's funeral, and the use of the terms "stupid," "lazy," and "boy" to address Brown. The sixth incident was the unfavorable work assignments Brown claimed he was given. These six incidents do not rise to a sufficient level of severity to constitute a hostile work environment, either collectively or individually.

First, Brown has not demonstrated that these incidents were based on his race. Although the connection "need not be explicit, 'there must be some connection, for not every perceived unfairness in the workplace may be ascribed to

10

discriminatory motivation merely because the complaining employee belongs to a racial minority.' " *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016); see also *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014) (" '[A]lleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race.' "). **W**hile McCoy's references to Brown as "stupid," "lazy," and "boy" in front of his coworkers, coupled with McCoy's frequent yelling of profanities at Brown and others in the Department, are enough to presume that Brown experienced subjectively unpleasant and uncomfortable situations, objectively they are not enough to demonstrate a hostile work environment. McCoy's comments to Brown indicating that he was "stupid" and "lazy" were offensive but not inherently racial. *See, e.g.*, *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) ("Title VII protects against discrimination, not personal animosity or juvenile behavior.") And although McCoy referencing Brown as "boy" could be probative of discriminatory animus, Brown has provided no context for its use. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (finding that use of facially neutral term "boy" could show racial animus based on circumstances). Brown asserts only that McCoy called him "boy" in 2017 but does not provide evidence that shows the comment was uttered in a discriminatory manner. The Court does not mean to downplay the offensiveness of McCoy's remarks, but on this record they are not severe or pervasive enough, standing alone, to create a hostile working environment.

Brown also alleges the hood incident created a hostile working environment because McCoy laughed along with Brown and his coworkers when a fellow employee who was white placed a white rag over his head. Brown believed the white rag was meant to evoke the hoods worn by the Ku Klux Klan. Brown did not report the incident to University officials for two years and then characterized the event as a coworker "just fooling around, and it was not a mean thing." (Doc. 86 at 10). Brown asked that University officials disregard the report. McCoy denied he witnessed the white-rag incident, as did others alleged to have been present.

The Court notes that there are no other allegations that this coworker engaged in any other behavior that could suggest he was imitating a member of the KKK. It would be unreasonable to expect that McCoy would automatically assume that a man with a white rag over his head was intended to be a racially inflammatory symbol, absent a complaint from someone who was subjectively offended. The Court does not mean to deprecate Brown's subjective feelings of racial animus; however, the fact that McCoy laughed with Brown and his coworkers when another coworker placed a white rag on his head is not objective racial harassment.

The Court acknowledges that the additional claims that McCoy told Brown that he should know how to better do his job after 13 years of experience, joked that he wished Brown would run out of gas while on vacation and not return to work, exhibited insensitivity when Brown attended a funeral while treating a grieving white coworker differently, and assigned Brown unfavorable work may be inappropriate and offensive comments and actions. Still, these incidents appear

isolated and, taken together, were neither sufficiently severe or pervasive to rise to the level of actionable harassing conduct. See *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720 (7th Cir. 2009) (noting that isolated incidents of nonsevere conduct will not constitute actionable harassing conduct). Thus, Defendant is entitled to summary judgment on Brown's hostile work environment claim.

### B. Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) the employer took a materially adverse action against the employee, and (3) there is a causal link between the protected activity and the adverse action. *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019). Defendant's Motion for Summary Judgment against the retaliation claim is granted because there are no facts to establish an adverse action against Brown. Brown did not oppose Defendant's Motion for Summary Judgment against him, and thus the Court considers Defendant's statement of facts undisputed. *See* discussion *supra*. The record shows that shortly after the University began its investigation into Brown's allegations, the Facilities and Services Department management entered into discussions with Brown about voluntarily transferring his employment from the machine room to the tool room. Brown accepted the offer to transfer into the tool room and expressed appreciation for the new assignment, stating that "it got him out of the machine shop, it made sense because he had worked in the tool room before, and the pay was the same." (Doc. 86 at 10). Brown has continued his employment with the University as a

machinist in the tool room. Absent evidence that Brown suffered an adverse action, Defendant is entitled to summary judgment on the retaliation claim.

## II. Defendant's Motion for Summary Judgment against Flemons

All facts come from Defendant's Statement of Undisputed Material Facts. (Doc. 86). Flemons has failed to respond to Defendant's Motion for Summary Judgment. Therefore, all factual assertions alleged by Defendant are deemed admitted. *See* discussion *supra*.

Flemons works as a brick mason in the Facilities and Services Department at the University. Flemons began employment with the University in 2008 and was laid off the following year. He returned to work in 2011 and has worked for the University continuously since that time. During all relevant periods, Flemons reported to his supervising foreman, Bruce Rodgers, who is white. Flemons is black. Although Flemons now asserts that Rodgers racially harassed him as early as 2008, the first record of Flemons reporting Rodgers for his alleged conduct is not until 2012.

In his amended complaint, Flemons alleges he "and other black employees" experienced "a racially hostile work environment," "starting even before his first day of employment" in 2008 and through January 2019. (Doc. 4). Flemons describes a series of incidents beginning with an allegation that on May 7, 2008, he returned Rodgers's telephone call and Rodgers responded: "What was the instruction I gave you!? How can you work for me if you can't follow my instructions?" On his first day of employment, Flemons alleged Rodgers told him he did not want to hire him but was forced to for "diversity reasons."

14

Flemons also claims that Rodgers volunteered Flemons to be laid off in 2009. When he was laid off, Flemons was "the least senior Brickmason." The University's standard practice dictates the last employees hired are typically the first employees laid off. Flemons acknowledged the layoff process typically "goes by seniority."

In April 2012, Rodgers was on the telephone with someone in Flemons's presence. Rodgers stated to this person, "Don't worry about that. I got this big black guy in my van that will tell them not to go that way." Also in April 2012, Flemons alleged that he and Rodgers had an argument before attending a retirement party for another employee. Flemons was preparing to attend the party when Rodgers, who had forgotten about the party, allegedly ordered Flemons to get into Rodgers's van so they could continue working. The two men exchanged obscenities. Flemons talked to Rodgers's supervisor and eventually got into the van. Flemons and Rodgers then drove to the retirement party.

After this incident, Flemons requested that the OAE engage him and Rodgers in an Informal Resolution Process regarding the retirement-party incident. On June 26, 2012, pursuant to the policies and procedures for addressing harassment and discrimination, the OAE conducted a mediation between Flemons and Rodgers. However, on July 31, 2012, Flemons filed a complaint with the OAE that requested the office conduct a formal investigation regarding Rodgers's alleged racial harassment. In his OAE complaint, Flemons alleged that he is the only black employee of the five brick masons that work in the shop and that the other four are white. He also claimed that throughout his employment, Rodgers made

15

discriminatory and inappropriate personal remarks, held him to more exacting standards than his white coworkers, and scrutinized his work more closely. Flemons alleged that, as soon as he was hired in 2008, Rodgers commented about him being unable to follow instructions and told him that he did not really want to hire him "but they're making me," implying Flemons was hired for diversity purposes. In the complaint, Flemons alleged that Rodgers would frequently critique his brick mason work, highlight his mistakes in front of his coworkers, and make comments that he was not a good listener. Flemons also claimed Rodgers used foul language with him, but not with his white coworkers, and that Rodgers had referred to him as a "big, black guy." Upon receiving Flemons's complaint, the OAE promptly began an investigation into his allegations of racial harassment,

On January 4, 2013, the OAE concluded its investigation and found that the evidence did not support Flemons's allegations and that Rodgers had not engaged in harassment on the basis of race. In reaching its conclusion, the OAE reasoned that Rodgers's only alleged comment based on race was his reference to Flemons as the "big, black guy." The OAE report stated that, "while this comment is inappropriate, a single comment about an employee's race is not sufficiently severe or pervasive to establish harassment."

As for the rest of Rodgers's conduct that Flemons claims constituted racial harassment, the OAE found many of his white coworkers experienced similar treatment as Flemons. The coworkers stated that they also were subject to mean-spirited and inappropriate comments, yelling, and unfair treatment. They also

16

pointed out that Rodgers micromanages and has unrealistic work expectations. Flemons has also acknowledged that Rodgers was a poor manager in general, not just for him. Since white employees also reported similar concerns about the work environment and treatment by Rodgers, the OAE was not able to determine by a preponderance of the evidence that Flemons was treated differently based on his race. The OAE did recommend, however, that Rodgers receive additional supervision and training to enhance the work environment.

Approximately five years after he filed his complaint with the OAE, Flemons claimed he saw vehicles with Confederate symbols parked on the UIUC campus on two occasions. He stated that a truck with a Confederate flag was parked on campus in a parking lot for University personnel in March 2017 and that a car with two Confederate flag stickers was parked multiple times in a parking lot for University personnel in June 2017. Flemons speculated the car belonged to a "transportation driver."

Finally, Flemons claims that in January 2019, Rodgers repeatedly questioned him about the whereabouts of a vacuum cleaner, while he only questioned a white coworker one time.

Since the OAE wrapped up its investigation in 2013, Flemons alleges that Rodgers has repeatedly denied him overtime opportunities, yet he does not identify a single instance in which he requested overtime and was not subsequently offered it. Around Christmas 2016, Flemons alleges that Rodgers told Flemons and his colleagues there would be an overtime opportunity, but Flemons claims that

Rodgers later took that opportunity for himself. On another unspecified date, Flemons alleges that Rodgers offered him overtime, but only after offering it to a few other employees, and Flemons refused it because he did not want to be the "last resort." On another unspecified date, Flemons said Rodgers took overtime for himself rather than asking Flemons. However, Flemons admits he did not ask for overtime on that specific occasion. Flemons acknowledges that once he complained about not receiving enough overtime, he started to get more overtime. Additionally, Flemons admits to multiple instances of being offered overtime and turning it down. The University has no record of Flemons reporting the alleged denial of overtime opportunities to the OAE or to Human Resources as a form of harassment or retaliation.

Flemons also alleges that he was not allowed to take a civil-service exam in October 2015 when Rodgers was his supervisor. After Flemons sent an online request to personnel services to take the exam, he claims he was told that he "was not qualified to take the test" because he "didn't have the experience." Flemons does not know who made this decision but alleges it was racially motivated because a white coworker was allowed to take the test. However, Flemons acknowledges that the coworker had been working at the University longer than he had at the time of the test. Flemons never reported that he was allegedly denied an opportunity to sit for the civil-service exam to the OAE or to Human Resources as a form of harassment or retaliation.

Flemons also alleges that Rodgers retaliated against him by issuing him an

unwarranted discipline in June 2016. On May 18, 2016, Flemons and Rodgers engaged in a heated exchange over work. Rodgers claimed that Flemons called him a "motherf***." On June 2, 2016, a pre-disciplinary meeting was held with the Operations, Maintenance, and Alterations Division ("OMA") to discuss Flemons's insubordination relating to the exchange with Rodgers, his alleged harassment of a coworker, and the quality of his work being unacceptable as a brick mason at a journeyman level. (Doc. 86-20). On June 9, 2016, the OMA department issued Flemons a six-month work-performance reminder, with the expectation that Flemons would conduct himself in a professional manner at all times and providing him detailed work-related expectations. Flemons never reported that he was allegedly disciplined without justification to the OAE or to Human Resources as a form of harassment or retaliation.

Flemons filed his Complaint on January 28, 2019, and an Amended Complaint on February 19, 2019. Defendant moves for summary judgment as to Flemons's remaining individual claims of hostile work environment and retaliation in violation of Title VII.

### A. Hostile Work Environment

Under Title VII, an employer may not discriminate based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). *See* discussion *supra*.

As an initial matter, Defendant argues that most of the incidents underlying Flemons' hostile work environment claim are time-barred. Flemons's allegations related to his discrimination claims span from May 2008 to January 2019. Flemons

had 300 days from the date each action allegedly occurred to file a charge with the EEOC. *Pruitt v. City of Chicago*, 472 F.3d 925, 927 (7th Cir. 2006). Flemons filed his charge with the EEOC on February 2, 2017, and an amended charge on May 18, 2017. Defendant does not challenge the timeliness of the allegations regarding (1) Rodgers's repeated questioning of Flemons in 2019 about whether he knew the whereabouts of a vacuum cleaner, and (2) Flemons's 2017 observation of two vehicles with Confederate insignia in parking lots reserved for University personnel. However, Defendant claims that the remainder of the allegations are time-barred and may not be considered.

The Court agrees that the remainder of the allegations (occurring in a time period between May 2008 and April 2012) are beyond the 300-day filing window. However, for purposes of Flemons's hostile work environment claim, the Court must consider whether the continuing violation doctrine can assist Flemons in seeking redress for these otherwise time-barred incidents. A hostile work environment claim is timely as long as any act falls within the statutory time period, even if the claim encompasses events occurring prior to the statutory time period. *Barrett v. Ill. Dep't of Corr.*, 803 F.3d 893, 898 (7th Cir. 2015). Although the continuing violation doctrine allows plaintiffs "to drag up ancient history, to the employer's prejudice, the length of time between incidents has been a consistent limiting factor." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017) (internal quotation marks and citations omitted).

In this case, the earliest allegation falling within the limitations period occurred in March 2017, *five years* after the timeliest allegations falling outside of the limitations period, which occurred in April 2012. Although "[t]here is no magic number; the question is whether 'the series of allegations describe continuous conduct rather than isolated incidents.' " *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 852 (7th Cir. 2019) (citing *Milligan-Grimstad*, 877 F.3d at 705). But the Seventh Circuit has concluded that a three-year gap "stretched the continuing violation theory beyond any workable limit." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 727 (7th Cir. 2004). In short, given the five-year time span between the events falling within the limitations period and the earlier allegations, no reasonable fact-finder would conclude that Flemons' allegations describe a "single chain, a single course of conduct" sufficient to defeat the statute of limitations. *Tinner*, 308 F.3d at 708. Accordingly, the Court considers all allegations time-barred, save the events that allegedly occurred in 2017, and in January 2019.

To the extent that Flemons asserts a hostile work environment claim, it must fail. As explained above, the only alleged actions this Court will consider are those that occurred in 2017 and 2019. None of the alleged conduct at issue is sufficiently severe or pervasive to establish a hostile work environment claim.

Flemons alleged he observed two vehicles with Confederate paraphernalia in parking lots reserved for University personnel. Flemons did not indicate he knew who owned the vehicles, identify any supervisor or other University employee who displayed the Confederate flag, or show that the conduct was directed at him

21

personally, as an African American, as opposed to a general audience. *See Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993) (noting that verbal communications cited as evidence of hostile environment were not directed at plaintiff personally). Isolated incidents, unless "extremely serious," will not support a hostile work environment claim. *Faragher*, 524 U.S. at 778. In order to be actionable under the relevant statutes, isolated incidents must be so severe that they "amount to discriminatory changes in the terms and conditions of employment." *Id.* (quotation marks omitted); *see also* 42 U.S.C. § 2000e-2(a)(1). Although displays of Confederate flags in the workplace may support a hostile work environment claim, they do not automatically do so. *See, e.g.*, *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (two distant incidents in which an employee was seen wearing clothing marked by the Confederate flag were too isolated and insufficiently severe to constitute a racially hostile work environment under Title VII). Flemons's report of two vehicles with Confederate flag decorations in parking lots reserved for University personnel describes conduct that is insufficiently severe or pervasive to support a hostile work environment claim.

With regard to Rodgers's repeated questioning of Flemons regarding a missing vacuum cleaner, in order to establish a harassment or hostile work environment claim, "[t]he conduct at issue must have a racial character or purpose." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). There is simply no racial character or purpose discernible from a supervisor asking Flemons if he knew

the whereabouts of a missing vacuum cleaner. Accordingly, Defendant is entitled to summary judgment on Flemons' hostile work environment claim.

**B. Retaliation**

In Count III, Flemons claims that Defendant retaliated against him following his complaints of racial discrimination. (Doc. 4 at 83). Title VII's anti-retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by opposing an unlawful employment practice or participating in the investigation of one." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592-93 (7th Cir. 2008) (citing 42 U.S.C. § 2000e-3(a)). To establish a retaliation claim under Title VII, Flemons must show "(1) he engaged in a statutorily protected activity, (2) his employer took a materially adverse action against him, and (3) there is a causal link between the protected activity and the adverse action." *Mollet*, 926 F.3d at 896.

Defendant first argues that any of Flemons's Title VII retaliation claims premised on conduct predating April 8, 2016, are time-barred because Flemons did not file his Charge of Discrimination with the EEOC until February 2, 2017 (amended on May 18, 2017). Only discrete acts that occurred within 300 days of Flemons's filing his charge of discrimination are permitted to establish his retaliation claim. *See generally Morgan*, 536 U.S. 101, 114–15. Any acts prior to the 300 days are similarly time-barred and irrelevant for the retaliation analysis. As a result, the only relevant allegations that remain are (1) Flemons's receipt of "unwarranted discipline" in June 2016 and (2) his alleged denial of overtime in December 2016.

23

An "adverse employment action" is an action that might "dissuade a reasonable worker from making or supporting a charge of discrimination." *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 382–383 (7th Cir. 2020) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 52 (2006)). In other words, "if the challenged action would discourage other employees from complaining about employer conduct that violates Title VII, it constitutes an adverse employment action." *Vance*, 646 F.3d 461, 473 (7th Cir. 2011). Although placing an employee on probation, in some cases, may constitute a materially adverse employment action, *see Smart*, 89 F.3d at 442, the Court does not believe that is the case here. Given the circumstances surrounding the University's actions in this case, the Court finds that the "unwarranted discipline" Flemons received in June 2016, a six-month work-performance reminder (probationary status) following a heated exchange with Rodgers, did not rise to the level of a materially adverse employment action. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 n.31 (7th Cir. 2012) ("[T]he district court correctly concluded that the written warnings and the placement of [plaintiff] on probationary status did not rise to the level of a materially adverse employment action"); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005) ("While [plaintiff's] negative evaluation, written warnings, and placement on 'proof status' are putatively disciplinary measures, none 'result[ed] in tangible job consequences and therefore are not adverse employment actions actionable under Title VII.' "). The Court does not believe that a reasonable

employee would be discouraged from filing a Title VII complaint as a result of the actions taken against Flemons.

Flemons also alleges retaliation based on Defendant's failure to award him overtime in December 2016. Although refusing to award overtime in certain circumstances may rise to the level of a materially adverse action, in this case Flemons has not established that he engaged in any protected activity that was causally linked to the type of overtime denial that is materially adverse. Flemons fails to identify a single instance where he requested overtime work and his request was denied. Moreover, he admits to multiple instances of being offered overtime and refusing the opportunity. In short, Flemons has failed to come forward with specific facts showing that there is a genuine issue for trial regarding whether he suffered retaliation for engaging in protected activity. *See, e.g., Basith v. Cook Cty.*, 241 F.3d 919, 933 (7th Cir. 2001). Absent evidence that Flemons suffered an adverse action, Defendant is entitled to summary judgment on Flemons's retaliation claim.

## III. Defendant's Motion for Summary Judgment against Jeffrey Taylor

Taylor has failed to respond to Defendant's Motion for Summary Judgment. Therefore, as discussed *supra*, all factual assertions alleged in Defendant's Statement of Undisputed Material Facts are deemed admitted.

Taylor began work for the University in March 2015 as a culinary worker and was placed at Ikenberry Dining Center as a cook. (*See* Doc. 86-24 at 2). Although Taylor testified he had a good working relationship with many of the food service supervisors, he filed a complaint with the OAE on October 20, 2017, alleging the

25

supervisory staff at the dining hall "began harassing me based on my race" beginning in February 2017. Taylor, who is black, did not detail the alleged harassment in his initial complaint, but he stated that he had "witnessed students and co-workers that I believe identify as people of color being harassed as well." Taylor added that the harassment "led me to be placed in dicipline [*sic*] and I do not feel that I should have been placed in discipline due to management's bias against people of color." Taylor eventually added to his complaint that food service supervisor Don Van Liew unfairly targeted him for various criticisms and subjected him to unwarranted discipline. Taylor alleged Van Liew, who is white, "discriminated and harassed him on the basis of his race."

Specifically, Taylor claimed that on October 20, 2017, Van Liew singled him out for not wearing his white chef's jacket. Instead, Taylor wore what he claimed was a University-approved polo shirt and black slacks, explaining that he had worked overtime that week and therefore did not have a clean chef's jacket. Taylor testified that this was the only instance on which Van Liew spoke to him about being out of uniform. The OAE interviewed Van Liew, who said University uniform policy required cooks to wear a white chef's jacket. According to Van Liew, he did not single out Taylor, and on various occasions he had spoken to at least eight other employees—three of whom are white—regarding a failure to comply with the uniform policy.

In his OAE complaint, Taylor also claimed on an unspecified shift that Van Liew refused to let him use a dining cart to move food from the kitchen to the

serving area. Taylor stated Van Liew told him he could not use the cart because he was saving it for student workers transporting dishes from the dining area to the kitchen. In an interview with the OAE, Van Liew recalled the cart incident occurred on the busiest night of the week, and that he reserved the carts for student workers transporting dirty dishes. Taylor also alleged Van Liew closely monitored him during a shift on October 30, 2017. Van Liew explained that he supervises the dining hall's operations and often moves around and monitors activities to make sure they are running smoothly, particularly in the front part of the dining hall where Taylor often worked. Van Liew said he was not trying to be "extra-vigilant" of Taylor but was supervising operations as normal. Taylor confirmed Van Liew supervised "front of the house."

Also in his OAE complaint, Taylor alleged that in November 2017, Van Liew asked Taylor to help a coworker with food preparation. Taylor responded that it was not part of his assigned duties—he needed to check his own station based on instructions from the executive chef—and refused to help. Van Liew explained that he only asked Taylor because it looked like he was not working, and that Taylor "used the 'F' word" in response to Van Liew's request. In the OAE report, the University concluded that "there was simply confusion between Taylor and Van Liew about [whether Van Liew or the executive chef's] directives take precedence and when."

Taylor reported that on another occasion, a new student worker rang up someone incorrectly, and Taylor asked for a supervisor to issue a refund. In the

meantime, Taylor started taking preorders for the students waiting in line. Taylor claimed Van Liew arrived to issue the refund and started yelling at Taylor about taking preorders. In his interview with the OAE, Van Liew said the student worker alerted him that Taylor needed more receipt paper and that Van Liew sent the student to grab some. When Van Liew finally arrived at Taylor's station, he said Taylor yelled at him and said the issue was the refund (not receipt paper). Van Liew issued the refund. The OAE found the refund incident occurred because Van Liew received misinformation from a student about what Taylor needed.

In July 2018, after investigating Taylor's claims, including interviewing four witnesses, the OEA found that "there is not a preponderance of the evidence that Van Liew's conduct was based on race." Instead, "the disagreements between Taylor and Van Liew were motivated by personality clashes and miscommunications rather than race." Two witnesses said they thought the disagreements between Taylor and Van Liew were not based on race but were "miscommunications in a stressful environment." One witness, a dining services employee who is black, said he never had the impression that Van Liew had an issue with Taylor because of his race and did not think "the squabbles between Van Liew and Taylor are based on race." Three witnesses mentioned that Taylor's personality leads to clashes. One witness said that Taylor's "regular tone of voice is loud and demanding," and that "people misinterpret this and find him to be intimidating." Another witness similarly said Taylor "has an authoritative voice and can sometimes be abrupt …

and intimidating." A third witness explained that Taylor has a "very loud personality that may at times rub people the wrong way."

In its report, the OEA recognized that Van Liew had moved to a different dining hall than Taylor and recommended that this arrangement continue. Taylor acknowledged to the OAE that the reassignment had changed his work environment "for the better." Taylor said he knew about his right to appeal the OAE finding but chose not to do so.

In a separate incident, Taylor alleged a black colleague, Paige Harrington, sent him a Facebook message that used the "N-word." Taylor accused Harrington of not weighing steaks properly at their dining hall station and reported Harrington to a head cook to "correct the problem." Not long after, in March 2018, Taylor claims Harrington sent him a Facebook message that said, in part, "[y]ou could've pulled me to the side and said what you needed to say about the steaks," instead of going directly to the supervisor, and that Taylor was "[t]rying to get a n*** in trouble." Taylor said he reported the message to the OAE and to Rita Davis, a member of the University's Human Resources Department. Taylor said this was the only time a coworker used that slur in a conversation with him, and that he has never heard a University employee—coworker or supervisor—use the "N-word" at work.

Taylor also claimed that another food service supervisor, Kalen Janowski, who is white, wrote to an acquaintance of Taylor's on Facebook, "I eat n***s like you." Taylor said he was scrolling Facebook on October 10, 2017, when he saw the comment made to his acquaintance, who does not work at the University. Taylor did

not speak to his acquaintance about the post. Taylor said he reported the Facebook post to a food service supervisor, Human Resources, and his union vice president. Taylor said he has worked with Janowski "a few times" at the dining hall and personally has never had any negative interactions with him.

Taylor said he stopped picking up overtime shifts at the dining hall to avoid Janowski and Van Liew but was still able to work overtime shifts in the catering department. Other than Janowski's Facebook post addressing an individual who is an acquaintance of Taylor's, Taylor did not offer specific instances of a supervisor using the "N-word."

Taylor also alleged that in December 2018, he heard from a black coworker named Danielle that a white cook told her that his child's favorite word is the "N-word." Taylor was not present when the cook allegedly said this to Danielle. Taylor did not remember Danielle's last name. She told Taylor about the incident and also allegedly told a supervisor. Taylor said the cook no longer works at the University and was "terminated for unrelated issues."

In another incident, Taylor said he observed a supervisor accuse a black student of stealing. Taylor "think[s]" a different supervisor called the police regarding the student, who had a malfunctioning meal card. Taylor admitted, however, he "personally didn't see the issue that went on with this particular student." He said there were no other incidents that concerned him between this supervisor and students. Taylor also claimed to be aware of a white coworker at another dining hall calling hip-hop or R&B music "monkey music" and possibly

referring to black co-workers as "monkeys." Taylor said he heard this from other coworkers but was not present for this alleged incident and could not remember specifics of what the white coworker allegedly said.

In its First Set of Interrogatories, the University asked Taylor to describe each instance of alleged retaliation. In response, although he pointed to individuals, years-long time frames, and broad swaths of the documents produced, Taylor failed to identify a single example of an alleged retaliatory act.

Taylor has received multiple complaints from coworkers about his disruptive and disrespectful behavior in the workplace, including being disrespectful to supervisors and coworkers, disregarding instructions, leaving food products on the kitchen floor, using profanity, and being absent from work without notice. On March 13, 2017, Taylor was given a six-month "work performance reminder" as a disciplinary measure for being "rude and argumentative" with supervisor Waqar Ehsan.

On November 13, 2017, Taylor allegedly threw a case of garbanzo beans across the floor causing damage to a stainless-steel air-cooling wall. Several employees witnessed the incident. Taylor was again placed on a six-month "work performance reminder" for this act.

### A. Hostile Work Environment

Courts consider hostile work environment claims under the totality of the circumstances. *See Lambert*, 723 F.3d at 868; *see also* discussion *supra*. Key to the Court's determination is whether the evidence in the record would permit a

reasonable factfinder to conclude that the harassment Taylor has identified was based on his race. *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). While harassment need not be explicitly racial in order to be probative of a hostile work environment, "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005). "[T]he alleged harassment must be sufficiently connected to race before it may reasonably be construed as being motivated by the defendant's hostility to the plaintiff's race." *Id.* at 864 (citing *Luckie*, 389 F.3d at 713 ("The conduct at issue must have a racial character or purpose to support a hostile work environment claim.")).

Based on the record before this Court, no reasonable jury could conclude that Taylor's race was a motivating factor for Van Liew or any other food service supervisor at UIUC. Title VII protects against discrimination, not "personal animosity or juvenile behavior." *Brown*, 700 F.3d at 1105. Taylor offers nothing more than his subjective belief and speculation that his race was a motivating factor for any action taken against him by Van Liew or any other food service supervisor; this is not sufficient to create a genuine issue of material fact. *See Lewis v. Ivy Tech State College*, No. 04-459, 2006 WL 1408398, at *3 (N.D. Ind. 2006).

The majority if not all of the remaining alleged conduct (the use of the "N-word," a possible reference to "monkey music" and "monkeys," and a supervisor's questioning of a Black student regarding suspected misuse of a dining card) is

either secondhand, isolated, lacking in racial animus, or some combination of the above. The most concerning incident alleged that a black coworker directed a comment to Taylor via a Facebook message, accusing Taylor of "[t]rying to get a n*** in trouble," following Taylor's reporting of the coworker's alleged workplace mistakes to a supervisor. Although clearly unacceptable conduct, an isolated incident like this involving a coworker does not rise to the level of environment that the Court has deemed hostile. *See, e.g. Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (isolated statements by coworker, including one use of the "N-word," did not rise to the level of objectively hostile environment). The other incidents either were not directed at Taylor or were not hostile.

In sum, a reasonable jury could not conclude from Taylor's unsupported allegations that he was subjected to a hostile work environment. Even if his allegations were considered evidence of harassment, there is no indication in the record that the conduct was racially motivated. Summary judgment is therefore granted as to Count I.

### B. Retaliation

For his retaliation claim, Taylor must offer evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by [his] employer; and (3) a causal connection between the two." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007)).

An action is "materially adverse" if it injures or harms an employee to such a degree that the employee might stop his or her protected activity. *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016). The test to determine whether an act is materially adverse is objective and depends on the circumstances of each case. *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006)). Examples of actions that rise to the level of an adverse action include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 456 (7th Cir. 2011). An employee's dissatisfaction with their employer's action does not make it adverse. *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001). However, "not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citation omitted). Nor does every "mere inconvenience or alteration of job responsibilities" constitute a materially adverse change in the terms and conditions of employment. *Boss v. Castro*, 816 F.3d 910, 918–19 (7th Cir. 2016).

Taylor has not shown that any of the acts he identifies were significant enough to deter a reasonable person from reporting discrimination. Although placing an employee on probation, in some cases, may constitute a materially adverse employment action, *see Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996), this Court does not believe that is the case here. The record shows Taylor has

received multiple complaints from coworkers about his disruptive and disrespectful behavior in the workplace. Taylor was given the "work performance reminders" for overt behavioral problems and not in retaliation for reporting alleged harassment to University officials. Defendant's Motion for Summary Judgment against the retaliation claim is granted because there are no facts to establish an adverse action against Taylor.

#### CONCLUSION

For the reasons set forth above, the Court GRANTS Defendant's Motions for Summary Judgment (docs. 80, 82, and 84) and terminates this case.

Entered this 29th day of September 2023.

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge
